# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| BRIGHTVIEW GROUP, LP, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Case No. SAG-19-2774 |
| | * | |
| ANDREW M. TEETERS, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiff Brightview Group, LP ("Brightview") filed this suit against Andrew Teeters ("Teeters"), Ross Dingman ("Dingman"), and Monarch Communities, LLC ("Monarch") (collectively, "Defendants") on September 19, 2019.  ECF 1.  Brightview filed an Amended Complaint on November 5, 2019, ECF 38, which each Defendant answered on November 19, 2019, ECF 51-53.  Brightview seeks compensatory and exemplary damages for Defendants' misappropriation of trade secrets, in violation of both the Defend Trade Secrets Act of 2016 and the Maryland Uniform Trade Secrets Act, breach of fiduciary duties, and unfair competition under Maryland law.  ECF 38, ¶¶ 106-35.  Brightview also seeks preliminary and permanent injunctive relief under each claim for relief.  *Id.*

On September 19, 2019, Brightview filed an Emergency Motion for Temporary Restraining Order and for a Preliminary Injunction.  ECF 3.  Defendants Dingman, ECF 9, and Teeters, ECF 15, opposed the TRO motion.  After reviewing the filings, the Court held a hearing on September 26, 2019.  ECF 18.  The Court ultimately denied the TRO motion, but ordered the parties to engage in expedited discovery for purposes of the Preliminary Injunction motion.  ECF 19 at 1-2.  The Court also set in a hearing on Brightview's Motion for Preliminary Injunction for

November 19, 2019. *Id.* at 2. Upon Brightview's request, and after the Court conducted a conference call with the parties, the Court postponed the hearing to January 16, 2020. ECF 50 (the Order); ECF 46 (Brightview's request). The Court has now held the hearing, ECF 77, and received supplemental filings from the parties on the Preliminary Injunction Motion, *see* ECF 67 (Defendants' sealed supplemental brief); ECF 69 (Brightview's sealed supplemental brief); ECF 85 (Defendants' redacted brief); ECF 86 (Brightview's redacted brief). Since the hearing, the parties have also filed supplemental briefing regarding the scope of Brightview's injunctive relief. ECF 81 (Brightview's proposed order); ECF 82 (Defendants' objections). No further hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons that follow, Brightview's Motion for Preliminary Injunction will be granted, although the relief will be somewhat more limited than requested.[1]

## I.    FACTUAL BACKGROUND

### A.    The Relevant Parties

Brightview is a developer and operator of approximately thirty senior living communities along the Mid-Atlantic coast, in Maryland, Virginia, Pennsylvania, New Jersey, New York, Connecticut, Massachusetts, and Rhode Island. ECF 69-15. Generally speaking, Brightview communities offer a number of differing levels of care, ranging from offering senior individuals an independent living setting, to offering a greater level of care for those who have Alzheimer's Disease or dementia. *See id.*

Marilynn Duker, Brightview's Chief Executive Officer (CEO), joined Brightview's predecessor company in 1982 and, prior to becoming CEO, served as Brightview's President

---

[1] The Court initially filed this Memorandum Opinion under seal on February 21, 2020. ECF 90. Because the parties agree that no redactions are necessary, ECF 94, the Court is publicly reissuing this Memorandum Opinion.

beginning in 2008. Prelim. Inj. Hrg. Tr. 35:3-7, Jan. 16, 2020. As CEO, Ms. Duker "direct[s] the overall strategy of the business, both the development company and [Brightview's] management company[,] and the investment of [Brightview's] equity funds." *Id.* at 35:10-14.

David Carliner is the Executive Vice President of Brightview. *Id.* at 55:25-56-2. As Executive Vice President, he directly supervises the members of Brightview's development group. *Id.* at 56:8-18. He also supervises the respective leaders of the project management and "financial and market analysis" groups. *Id.* at 56:16-20. In total, Mr. Carliner has been with Brightview for seventeen years. *Id.* at 56:14-15.

Defendants Andrew Teeters and Ross Dingman are former Brightview employees. ECF 15-1, ¶¶ 3-4, 9 (Teeters Aff.); ECF 9-1, ¶¶ 1-2 (Dingman Aff.). Teeters began his employment with Brightview in 2006 as a Development Director. ECF 15-1, ¶ 3. In that position, he was in charge of "identifying sites to develop Brightview communities[,] as well as obtaining the necessary jurisdictional approvals to construct the communities." *Id.* In December, 2017, Teeters was promoted to Senior Vice President for Development. *Id.* ¶ 4. In this position, Teeters oversaw the site selection and development of Brightview communities. *Id.* Teeters left Brightview at the end of July, 2019. *Id.* ¶¶ 9-11.

Dingman worked for Brightview from August, 1998 through August, 2019. ECF 9-1, ¶ 1. Dingman received four promotions during his tenure with Brightview, his last being to the position of Vice President of Operations in 2012. *Id.* ¶ 2. In that position, he led Brightview's start-up operations for new communities, and was also involved in "market selection, site selection, product mix, product development, community design[,] and underwriting development." *Id.* ¶ 3. He was also "thoroughly involved in the design and development of

nearly all of Brightview's policies, manuals, guidelines, reports, system integrations[,] and overall operations." *Id.* ¶ 4.

Michael Glynn, who is not a party to this suit, worked for Brightview from 2011 to 2015, but left to take a position as a Vice-President of Development at National Development, a "development, construction, and property management company that has senior living projects as part of its portfolio." ECF 15-1, ¶ 8. National Development is based in Boston, Massachusetts. *Id.*

Just prior to Teeters's and Dingman's departures from Brightview, Glynn filed a certificate of incorporation for the company "Monarch Communities, LLC" in Delaware on July 10, 2019. *Id.* ¶ 15; *see* ECF 1-3 (Monarch's Certificate of Formation). One of Monarch's members is a company called "RAM HoldCo, LLC." ECF 15-1, ¶ 14. Glynn, Dingman, and Teeters are the members of RAM HoldCo. *Id.*

## B. Information that Brightview Creates and Uses to Develop Senior Living Communities

In considering the information that Brightview claims as trade secret, it is helpful to understand how that information is created, and used, in the process of developing a new senior living community.

### 1. Product Development

According to Mr. Carliner, one of the first steps in developing new senior living community development is product development. Hrg. Tr. 57:19-58:21. This involves "understanding who the customer is, what are the wants, what are the desires" of both the senior individuals and their families. *Id.* at 58:24-59:3. Over twenty-five-plus years, Brightview has continually developed its product, and distilled it into "over 200 detailed standards and policies and procedures" in its Operational Guidelines manual. *Id.* at 44:24-46:15; Hrg. Ex. 41

(Brightview Operational Guidelines). The Operational Guidelines detail how Brightview seeks to operate each of its forty communities along the east coast, and according to Duker, to ensure that each is operated "in a manner that is consistent with the brand and reputation that we want to uphold and the level of quality with which we want to operate." Hrg. Tr. 45:13-19. Duker testified that each senior living community operating company likely has such a manual, because companies must share their policies and procedures with the state in order to get licensed to operate. *Id.* at 46:7-10. However, "each [operating manual] is unique to the company that prepares it and how they choose to operate their communities." *Id.* at 45:25-46:3.

Revisions to its Operational Guidelines are not the only way Brightview engages in product development. In 2019, Brightview hand-selected four of its senior executives – Dingman, Teeters, and two others – to participate in a year-long leadership development program at the University of Maryland, Baltimore County ("UMBC") Training Institute. Hrg. Tr. 37:1-38:21. Brightview invested over $150,000 for those four executives to attend the program in order to "envision and develop a strategy and detailed recommendations for the future physical product and service model for Brightview for the future." *Id.* at 37:15-20.

Out of the effort and expense came the document, "Brightview Senior Living Product Development." ECF 69-42. The document contains the committee's ideas and recommendations for new additions and improvements to over twenty different aspects of Brightview's product. *Id.* One of those aspects is Brightview's staffing of its communities. *Id.*; Hrg. Tr. 39:15-40:8. According to Duker, "One of the holy grails for the senior living industry is figuring out how to deliver a more affordable product." Hrg. Tr. 39:25-40:2. Indeed, "[s]ince about 75 percent of [Brightview's] cost is staffing," the committee explored various ways to reduce staffing costs. *Id.* at 40:2-8. The committee also explored ways to improve services

offered to residents. *Id.* at 40:14-22. Brightview does not share this product development information with competitors. *Id.* at 41:11-15. If a competitor did obtain access to this information, Duker testified, then they would have ready insight into a senior living product for a future, and ways of improving their product immediately. *Id.* at 41:1-8.

        2.   <u>Market Analysis</u>

From product development, Brightview's focus shifts to market analysis, which entails two parts. Hrg. Tr. 59:5-19. First, Brightview works to determine a "primary market" for a new senior living community. *Id.* The "primary market area" is the area "where you think the majority of your residents will come from," considering factors such as geographical barriers (e.g., rivers and mountains) or territorial boundaries (e.g., city or county lines). *Id.* at 59:7-12. Upon defining a primary market area, Brightview then begins to perform a demographic analysis of that area, "looking at both the seniors as well as the children, to see how many of them are there." *Id.* at 59:13-15. Performing such a demographic analysis allows Brightview to pinpoint potential submarkets within the larger market. *Id.* at 59:13-19.

One example of a long-term demographic analysis is one that Teeters helped create for Brightview. Hrg. Tr. 64:14-66:25. In the year prior to Teeters's departure from Brightview, Teeters led a year-long, internal interdisciplinary group, with "something like a dozen" of Brightview's top senior executives, focused on analyzing future development opportunities both within Brightview's current markets, and within new, undeveloped markets. Hrg. Tr. 64:14-65:3. The product of that effort was a presentation that compiled publicly-available census data, plus the locations of current and in-development Brightview communities, to identify viable submarkets. *Id.* at 65:18-66:25. To do so, the intradisciplinary group established certain adult-child income and population density benchmarks, and applied those benchmarks to the relevant

market areas. *Id.* Based on the application of those benchmarks, along with the presence of existing and under-development Brightview communities, Brightview could pinpoint opportunities for further development around Boston, Washington, D.C., Baltimore, Philadelphia, and New York. *Id.*; *see* ECF 69-14 (the presentation). Carliner testified that while other companies likely perform similar demographic analyses, the benchmarks Brightview established were its own, developed through its years of experience. Hrg. Tr. 66:18-25. In Carliner's forty years of experience in the senior living industry, "[n]o one has ever shared their detailed demographic analysis with [him,] and [he] ha[s] never shared it with any of them." *Id.* at 67:7-11.

Outside of this specific document, Brightview also generally relies on documents called "heat maps" to evaluate new primary market areas. *Id.* at 95:17-96:17. Heat maps are graphic depictions of where Brightview's current residents used to live, before moving into a Brightview community. *Id.* at 95:23-25. This information is "incredibly valuable," according to Carliner, because if Brightview is considering placing a site in Pasadena, Maryland, then they can use heat maps generated by Brightview's opening a Severna Park, Maryland community to determine whether that Severna Park community "pull[ed] lots of people from Pasadena or nobody from Pasadena." *Id.* at 96:2-17; *see* ECF 69-29 (heat maps). Brightview does not have access to competitors' heat maps, nor do competitors have access to Brightview's heat maps. Hrg. Tr. at 96:21-97:1.

Once Brightview finds a viable primary market area, it then works to determine which submarket within that larger area is most profitable based on myriad factors, such as the number of existing Brightview and/or competitor senior living communities, the service(s) those communities provide, and the prices of the current services. *Id.* at 59:13-19.

First, as to currently-existing Brightview communities, Brightview has "all the information" that it needs to fully perform this analysis. *Id.* at 60:2-9. Brightview gets this information from several documents it creates and maintains, including "lease-up pace reports," ECF 3-3, ¶ 10 (Carliner Decl.)[2], "pricing sheets," Hrg. Tr. 41:22-43:7, "annual accrual accounting statements," *id.* at 43:9-44:17, and "cross-property operating reports," ECF 3-3, ¶ 11; *see also* ECF 69, Digital Ex. C.[3]

Lease-up pace reports "measure activity for new communities that have not yet reached stabilization (defined as 94% occupied, maintained for at least sixty days)." ECF 3-3, ¶ 10. For each of the first twelve months before a new Brightview community opens, Brightview tracks the number of deposits accepted from incoming residents, and when those deposits are received. *Id.* This report allows Brightview to determine whether there will be a sufficient number of residents in the building once the community opens. *Id.* In the market analysis stage, lease-up information can be helpful in determining whether a new community in a market Brightview is already present in will be viable – if the existing community leased up quickly, that is an indicator that a new community will also be successful. Hrg. Tr. 88:3-5, 88:16-22. None of this information is disseminated outside of Brightview. ECF 3-3, ¶ 10.

Brightview also has at its disposal documents for each community, referred to as "pricing sheets." Hrg. Tr. 41:22-42:19; *see* ECF 69-36 (Brightview Severna Park pricing sheet). Pricing sheets lay out detailed pricing information for each of a community's individual units, including the size of the unit, the number of bedrooms and bathrooms, and more detailed information, such as "the floor it's located on, the views it has, [and] whether it has a balcony or patio." Hrg. Tr. at

---

[2] The Carliner Declaration is also attached to Brightview's Supplemental Brief as ECF 86-30.

[3] Brightview only provided the Court with a copy of a cross-property operating report in its native Excel format; it does not appear on the public docket.

42:4-14.  It also lists both a unit's street rate – what Brightview charges a new resident – and renewal rate percentages – the annual rate increases for in-place residents.  *Id.* at 42:22-24, 43:3-6.  According to Duker, Brightview "would never, ever share" any of this information with competitors.  *Id.* at 42:15-16.

Brightview can also evaluate an existing community's viability through documents known as "annual accrual accounting statements."  *Id.* at 43:9-24; *see* ECF 69-37 (Accrual Accounting Statement for July, 2018 to June, 2019 for Brightview's North Andover location in Massachusetts).  These statements break down, "in a great level of detail," the expenses and revenue for the entire community, including what Brightview charges and serves for guest meals, the amount of room delivery charges, how much Brightview pays its associates, and "very detailed information about how [Brightview] price[s] every single apartment."  Hrg. Tr. 43:18-24, 44:5-13.  Duker reiterated that these statements provide "an incredible level of detail that, again, one would never, ever share with a competitor."  *Id.* at 44:11-13.

Finally, on a broad scale, Brightview may utilize "cross-property operating reports" to compare the operating performance of all Brightview communities to one another.  ECF 3-3, ¶ 11.  The reports can compare, for instance, the budgeted and actual hours worked by staff at the communities, and may also contain information regarding each community's staffing model.  *Id.* One version of the report includes key performance indicators such as each community's overall financial performance (measured both year to date and year over year), move ins and move outs for the previous nine years, expense information, and concession details.  *Id.*; Digital Ex. C. These reports also are not disseminated outside of Brightview.  ECF 3-3, ¶ 11.

As to communities run by its competitors, however, Brightview has none of this information.  Hrg. Tr. 60:10-15.  Carliner testified that he sometimes goes into a competitor's

community, and is able to talk with a representative to get a "general sense" of whether the community is fully occupied or struggling, how long it took to fill up, and some general information about pricing, such as "a one bedroom starts at this rate, two bedroom starts at that rate." *Id.* 61:7-14. Brightview may also send "mystery shoppers" into a competitor's community to get more particular details about the services the community could offer for a specific (made up) case, such as a parent who is beginning to have cognitive issues. *Id.* at 62:7-63:2. These "mystery shoppers" only get in-depth detail about a narrow scope of the community's offerings. *Id.* When competitors come into a Brightview community, associates will likewise share "general information" with them about the Brightview community. *Id.* at 63:16-20.

3.    Site Selection

Once Brightview has identified a viable submarket, its final step is to find a suitable site to build its community. Brightview utilizes two tools: its development pipeline, and its underwriting template.

Brightview's development pipeline is one of "the most valuable things in [its] development company." Hrg. Tr. 93:14-15. A large part of a developer's role with Brightview is forming relationships with brokers, because most sites suitable for senior living communities are not formally listed for sale, but are advertised to a select few individuals through a real estate broker. *Id.* at 92:7-93:3. The pipeline, then, represents the different sites that Brightview developers have obtained leads on as potential locations for a new community. *Id.* at 90:12-92:6; ECF 69-11. In Carliner's words, Brightview spent "lots and lots and lots of time, over long periods of time" creating its pipeline. Hrg. Tr. 93:7-8. While Carliner may know when another

competitor is developing a particular site, he has "no idea" what competitors "are thinking about possibly developing in the future." *Id.* at 93:22-94:4.

Assuming that a site is still available, Brightview will perform an "underwriting" of the site to determine whether it is financially viable. Hrg. Tr. 72:10-73:11. The underwriting is a Microsoft Excel-based tool that uses data points from other Brightview communities, plus assumptions developed by one Brightview staff person, that, combined together, are what Brightview believes is "the most accurate way" to project the costs of a new community. *Id.* at 76:20-80:1; Digital Ex. A. The tool contains at least "tens of thousands of data points" from all of Brightview's projects, and at least "thousands of formulas" that Brightview has developed, based on that data, to estimate a potential project's costs. Hrg. Tr. 81:1-16. In all, Brightview has invested "millions of dollars over decades" to get the underwriting tool to its current state. *Id.* at 84:9-10. While other competitors create underwritings, none have access to Brightview's proprietary underwriting tool. *Id.* at 84:16-19, 85:25-86:3.

### C.    Teeters and Dingman Begin to Form a Competing Senior Living Community Development Business While Employed with Brightview

At some point in 2018, Teeters and Dingman (while still employed with Brightview) began collaborating with Glynn on starting their own senior living venture. ECF 9-1, ¶ 8; ECF 15-1, ¶ 8. Throughout 2018, and into 2019, Teeters, Dingman, and Glynn made several efforts to attract investors to their new business. On September 29, 2018, Teeters sent Dingman and Glynn a "sample underwriting" for a hypothetical senior living community in Ellicott City, Maryland. ECF 69-7; Digital Ex. A (the Ellicott City underwriting). This "sample underwriting" contained less than twenty changes to the tens of thousands of data points present in one of Brightview's underwritings for its Columbia, Maryland site. Hrg. Tr. 81:8-11, 82:2-84:6. The next day, Teeters sent this same underwriting to a potential third-party investor. ECF 69-9. Teeters also

sent the same underwriting, along with a document entitled "Maryland and Virginia Senior Living Pipeline," to a different prospective third-party investor on October 27, 2018. ECF 69-10. The pipeline he sent, ECF 69-11, contained properties that Teeters and Carliner had discussed at length in the course of Teeters's employment with Brightview, Hrg. Tr. 89:11-92:6.

In January, 2019, Dingman created a document entitled "Community Openings," in order to "share experience [he] had operationally with start-ups." Hrg. Tr. 170:11-25; ECF 69-15. The document contains the precise "lease-up period" for each of Brightview's thirty communities. ECF 69-15. The Community Openings document also details when each community opened, the number of units in each community, the types of living offered (whether it be independent living, assisted living, and/or dementia care), the total project cost, and the total cost per unit. ECF 69-15. While the total project cost is oftentimes listed in press releases, Carliner testified that that public number is "rarely accurate." Hrg. Tr. 88:13-14. Otherwise, the specificity of information listed in the document is not publicly known. *Id.* 87:17-21.

Later in January, 2019, Teeters, Dingman, and Glynn met with National Development. ECF 69-13. The agenda for that meeting included a presentation entitled, "National Development Mid-Atlantic Market Opportunities," and a segment called, "Why Breakaway from Brightview." *Id.* The Market Opportunities PowerPoint contains demographic analyses and heat maps identical to ones Brightview previously created, and even includes references to "BV" communities. ECF 32-6 (comparing Defendants' presentation with Brightview's version). To this day, Monarch and its members remain in negotiations with National Development. ECF 86-2 at 186:12-187:7 (Teeters Dep., Jan. 7, 2020). According to Glynn, there is an "understanding" that National Development "really liked us and would invest in us on a project-by-project basis, if . . . an opportunity that made sense arose." ECF 86-3 at 59:6-9 (Glynn Dep., Jan. 8, 2020). In

fact, Teeters, Dingman, and Glynn evaluated two project *pro formas* for National Development, and included in those evaluations Brightview data regarding specific development costs on various projects. ECF 69-16.

Teeters and Glynn continued sending documents containing Brightview information to third-party investors in February and March, 2019. ECF 69-17 (February, 2019 email from Teeters to a third-party investor, attaching the Ellicott City underwriting, project pipeline, and a document entitled "Historic Deal Summaries.pdf"); ECF 69-18 (March, 2019 email from Glynn to the same investor containing "a summary of Brightview fund performances"). Also in March, 2019, Teeters asked another Brightview employee to run a demographic analysis for Alexandria, Virginia, which he then sent to Dingman and Glynn. ECF 69-20.

In April, 2019, Brightview offered Teeters the opportunity to become a partner in the business. ECF 15-1, ¶ 7. Teeters was given until June 30, 2019 to decide whether to accept the offer. *Id.* At that time, Teeters did not inform Brightview that he was considering leaving Brightview to pursue a new venture with Dingman and Glynn, "nor did [he] understand [he] had any obligation to do so." *Id.* ¶ 9.

In that same month, April, 2019, Teeters, Dingman, and Glynn sought investment funding from Mark Stebbins, the CEO of ProCon, an architecture, engineering and development firm based in New Hampshire. ECF 85 at 10; ECF 86 at 15. After Stebbins indicated that he needed "a lot more detail" to determine whether Teeters, Dingman, and Glynn's company would be "profitable enough" for him, Glynn sent Stebbins a sample underwriting that Teeters previously compiled on a hypothetical senior living facility in Pasadena, Maryland. ECF 69-21.

From May through the end of June, 2019, Teeters, Glynn, and Dingman continued to reach out to third-party investors, using various documents to demonstrate their company's

profitability. These documents included: a hypothetical underwriting for a New Rochelle, New York senior living facility that Dingman priced at rates "$200-$400" over those at Brightview Tarrytown, ECF 69-22; copies of the "Brightview Crofton" schematic design, ECF 69-23; and a demographics analysis of the Portsmouth, New Hampshire market that included, in the transmission email, a notation of what Brightview's benchmarks are for that type of analysis, ECF 69-26. In fact, in June, 2019, Teeters sent Stebbins an underwriting for a hypothetical Portsmouth facility and told Stebbins to "[f]eel free" to send the underwriting to an investor that had indicated interest to Stebbins. ECF 69-27. Teeters also sent Dingman and Glynn heat maps and "income band" analyses for the Pasadena area in June, 2019. ECF 69-28, -29.

On June 24, 2019, Teeters informed Brightview that he would not be accepting the partnership offer. ECF 15-1, ¶ 7. One week later, on July 1, 2019, Dingman was informed that he was being terminated. ECF 9-1, ¶ 10. Due to other circumstances in the company, however, Dingman agreed to stay on with Brightview on a temporary basis. *Id.* ¶ 14. Shortly thereafter, towards the end of July, 2019, Dingman took a previously-scheduled two-week vacation. *Id.* ¶ 15. While Dingman was on vacation, on July 30, 2019, Teeters submitted his resignation, and gave thirty days' notice. *Id.*; ECF 15-1, ¶ 9. That day, Teeters discussed with Carliner his resignation, as well as "the status of approximately 16 projects" Teeters was working on. ECF 15-1, ¶ 9. Teeters again did not disclose his future plans with Dingman and Glynn, nor did he feel that he had any obligation to do so. *Id.* Dingman, however, avers that he had previously told Brightview leadership that he intended on starting a competing business. ECF 9-1, ¶ 12. When Dingman returned from his vacation, on August, 12, 2019, he was informed that he was being terminated, effective immediately. *Id.* ¶ 15.

During their time with Brightview, including the month leading up to their respective departures, Teeters and Dingman used personal storage devices to store Brightview documents. ECF 9-1, ¶ 17; ECF 15-1, ¶ 13. A forensic analysis of those devices confirmed that thousands of Brightview documents were present on those drives upon Teeters's and Dingman's departure from Brightview. ECF 3-5, Ex. A (Spreadsheet of Documents on Teeters's and Dingman's drives). The reports indicate that, in June and July, 2019, Teeters and Dingman downloaded to their drives myriad Brightview documents, including: underwritings; heat maps; pricing sheets; Brightview's operational guidelines and operating agreement; lease-up pace reports; cross-property operating reports; annual training checklists; annual accrual accounting statements; systems training curricula; and demographic analyses. ECF 3-3; ECF 3-5.

After litigation ensued, Dingman and Teeters sent their personal storage drives to a third-party custodian, Sensei Enterprises, Inc. ("Sensei"), to preserve them for the pendency of the litigation. ECF 9-1, ¶ 18; ECF 15-1, ¶ 19; ECF 15-13 (Maschke Decl., CEO of Sensei). Sensei has also preserved Dingman and Teeters's personal email accounts. Hrg. Tr. 195:12-15 (testimony of Philip Depue).[4] Days prior to the injunction hearing, Sensei deleted a set of emails containing Brightview information from those accounts, according to a list that Defendants' counsel provided. *Id.* at 193:24-195:4.

---

[4] Plaintiff's counsel objected to Mr. Depue's testimony because Mr. Depue was never identified as someone with knowledge of the facts of this case, though Brightview was aware of Sensei's involvement. Hrg. Tr. 192:7-193:15, 195:19-25. The Court allowed Mr. Depue to testify, but reserved on the issue of whether Mr. Depue's testimony would be considered. *Id.* at 193:16-19, 196:1-4. Because Mr. Depue's testimony does not obviate the need for injunctive relief, the Court will consider Mr. Depue's testimony, without ruling on the substance of Plaintiff's objections.

## II. LEGAL STANDARDS

A preliminary injunction affords "'an extraordinary and drastic remedy' prior to trial." *Ultimate Outdoor Movies, LLC v. FunFlicks, LLC*, 2019 WL 2642838, at *6 (D. Md. June 27, 2019) (quoting *Munaf v. Green*, 553 U.S. 674, 689–90 (2008)); *see also MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (stating that preliminary injunctive relief is an "extraordinary remed[y] involving the exercise of far-reaching power [that is] to be granted only sparingly and in limited circumstances") (citation omitted). Since preliminary injunctions are intended to preserve the status quo during the pendency of litigation, injunctions that "alter rather than preserve the status quo" are disfavored. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 n.8 (4th Cir. 2019). Courts should grant such "mandatory" preliminary injunctions only when "the applicant's right to relief [is] indisputably clear." *Id.*

A preliminary injunction is warranted when the movant demonstrates four factors: (1) that the movant is likely to succeed on the merits, (2) that the movant will face irreparable harm in the absence of preliminary relief, (3) that the balance of equities favors preliminary relief, and (4) that injunctive relief is in the public interest. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345-46 (4th Cir. 2009) (quoting *Winter*, 555 U.S. at 20), *vacated on other grounds and remanded*, 130 S. Ct. 2371 (2010), *reaff'd in part and remanded*, 607 F.3d 355 (4th Cir. 2010). The movant must establish all four elements in order to prevail. *Pashby v. Delia*, 709 F.3d 307, 320–21 (4th Cir. 2013). Ultimately, the decision to issue a preliminary injunction is committed to the trial court's discretion. *Id.* at 319.

## III.   ANALYSIS

Brightview seeks injunctive relief pursuant to its four claims:  misappropriation of trade secrets, under both federal and Maryland law; breach of fiduciary duties; and unfair competition. ECF 3.  Both the federal Defendant Trade Secrets Act ("DTSA") and the Maryland Uniform Trade Secrets Act ("MUTSA") provide that a Court may grant an injunction to enjoin "actual or threatened" misappropriation of trade secrets.  18 U.S.C. § 1836(b)(3)(A)(i) (2018); Md. Code Ann., Com. Law § 11-1202(a) (West 2019).  Moreover, Maryland courts may enjoin defendants found liable under the tort of unfair competition.  *See, e.g.*, *GAI Audio of N.Y., Inc. v. Columbia Broad. Sys., Inc.*, 27 Md. App. 172, 192-93 (1975).  Brightview has demonstrated a likelihood of success on its federal and state trade secret misappropriation claims, and on its state law unfair competition claim.  Accordingly, the Court need not discuss the merits of Brightview's breach of fiduciary duty claims.

### A.   Brightview is likely to succeed on the merits of its claims.

#### 1.   Brightview has demonstrated a likelihood of success on its claims of trade secret misappropriation.

To establish misappropriation of a trade secret under federal law and Maryland state law, Brightview must demonstrate that the documents at issue are trade secrets, and that that Defendants misappropriated those trade secrets.  *See* 18 U.S.C. §§ 1836(b)(1), 1839(3), 1839(5); Md. Code Ann., Com. Law § 11-201(c).  Brightview has shown a likelihood of success on both elements.

##### i.   *Brightview has shown a likelihood of success in establishing that some of the documents at issue are trade secrets.*

"[A]ll forms and types of financial, business, scientific, technical, economic, or engineering information," regardless of whether it is tangible or intangible, or how the

information is stored, memorialized, or maintained, can qualify for protection as a "trade secret" under the federal Defend Trade Secrets Act.  18 U.S.C. § 1839(3).  However, such information only becomes a trade secret if (1) the owner of the trade secret takes "reasonable measures to keep such information secret," and (2) the information "derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure of use of the information." *Id.* § 1839(3)(A)-(B).

Similarly, the Maryland Uniform Trade Secrets Act defines a "trade secret" as any information that the owner "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use," and takes reasonable efforts to maintain its secrecy.  Md. Code Ann., Com. Law § 11-1201(e).  To determine whether information is a trade secret, Maryland courts assess: (1) the extent to which the information is known outside of plaintiff's business; (2) the extent to which it is known by employees and others involved in plaintiff's business; (3) the extent of measures taken by plaintiff to guard the secrecy of the information; (4) the value of the information to plaintiff and competitors; (5) the amount, effort, or money expended by plaintiff in developing the information; and (6) the ease or difficulty with which the information could be acquired or duplicated by others.  *AirFacts, Inc. v. de Amezaga*, 909 F.3d 84, 95 (4th Cir. 2018) (citing Restatement (First) of Torts § 757 cmt. b); *see also Ultimate Outdoor Movies, LLC*, 2019 WL 2233535, at *17 (quoting *Allan M. Dworkin, D.D.S., P.A. v. Blumenthal*, 77 Md. App. 774, 781-82 (1989)).

First, Brightview claims that its underwritings are trade secrets.  Those underwritings are not disseminated outside of Brightview, and only 125 of Brightview's 4,300 employees have

access to the underwritings. Hrg. Tr. 81:17-22, 85:25-86:18. Brightview has also shown that the underwritings are highly valuable to competitors. If a competitor had access to the proprietary formulas and data compiled in Brightview's underwritings, the competitor could improve its own underwriting tool and better predict the financial success of potential senior living community sites. The competitor could also gain an inside view into Brightview's financials, enabling the competitor to outprice Brightview in a particular market. *See id.* at 76:2-10, 76:20-23, 77:12-19, 80:2-10, 85:2-6, 85:9-13, 85:21-24. Brightview continuously works on fine-tuning its underwriting template, at a cost of "millions of dollars." *Id.* at 74:7-16, 83:9-15.

These facts will likely suffice at trial to establish that Brightview's underwritings are trade secrets under federal and state law. *See AirFacts, Inc.*, 909 F.3d at 96-97 (deeming as trade secrets, under Maryland law, documents containing information available to all database subscribers that an individual compiled into a more accessible format through "painstaking, expert arrangement"); *Motor City Bagels v. Am. Bagel Co.*, 50 F. Supp. 2d 460, 478-79 (D. Md. 1999) (finding that a business plan was a trade secret because it included "personal insights and analysis brought to bear through diligent research and by marshaling a large volume of information"); *LeJeune v. Coin Acceptors, Inc.*, 381 Md. 288, 309-10 (2004) (deeming pricing information that disclosed an employer's manufacturing costs and profit margins trade secret because of the "unique, competitive nature of the currency acceptor industry"); *cf. Albert S. Smyth Co. v. Motes*, No. CCB-17-677, 2018 WL 3635024, at *4 (D. Md. July 31, 2018) (deeming as trade secrets, for the purposes of a motion to dismiss, documents containing customer lists, pricing sheets, and business strategies).

Defendants lodge three objections. The first two are that the underwritings are not secret, nor are they independently valuable as a secret. ECF 85 at 13-14. As demonstrated above, these

assertions are unsupported by evidence. Even if there are other underwriting templates publicly available, Brightview's template – containing its own nuanced, data-specific formulas and data amassed over twenty-five years in business– is not, and it likely holds independent value as a secret, as demonstrated by Mr. Carliner's testimony.

Defendants' third objection is that Brightview does not take sufficient measures to keep its underwritings a trade secret. ECF 85 at 14-17. The Court disagrees. Brightview is likely to succeed in showing that the confidentiality policy contained in its handbook, ECF 69-44, § 5.6, coupled with its restriction of access to the underwritings to approximately three percent of all Brightview employees, constitute reasonable security measures in this case. That Brightview employees could copy underwritings onto a personal storage device, ECF 85 at 15 (citing ECF 85-2 at 348:11-356:10), does not undercut this notion. Nor does the fact that Dingman disregarded a Brightview executive's orders, and shared underwritings with some Brightview community directors (all of whom did not have digital access to the underwritings). *See* ECF 85-3 at 183:16-184:17 (Engle Dep., Brightview Corporate Designee, Dec. 19, 2019). There is no evidence that Brightview's policy and security measures led to routine disclosures of the underwriting template to outside third parties, except by high-level employees determined to disregard their confidentiality obligations. *Compare with Motor City Bagels*, 50 F. Supp. 2d at 480 (finding that the plaintiff failed to take reasonable security measures because it gave its claimed trade secret business plan to third parties without requiring them to execute a confidentiality agreement); *Montgomery Cty. Ass'n of Realtors, Inc. v. Realty Photo Master Corp.*, 878 F. Supp. 804, 814 (D. Md. 1995) (holding that a realtor association failed to take reasonable security measures because it distributed information in its database widely to its members and to potential purchasers).

Defendants also argue that Brightview's security measures are insufficient because it does not require its employees to sign employment agreements or covenants. ECF 85 at 16. This argument is unpersuasive. The law only requires Brightview to take *reasonable* security measures, not the best security measures available. Brightview requires its employees to sign to acknowledge all policies in its handbook, which includes its confidentiality policy. *See* Hrg. Tr. 49:14-24, 50:10-12. It also restricts access to its underwritings to only 125 of its 4,300 employees. Considering these facts, and the nature of Brightview's business, the Court finds that these measures are reasonable. *See NaturaLawn of Am., Inc. v. West Group, LLC*, 484 F. Supp. 2d 392, 399 (D. Md. 2007) (finding that a franchisor took reasonable steps to keep its trade secret customer list secret, despite all franchisees having the list, because the franchise agreements provided for their return upon the end of the franchise relationship); *cf. Albert S. Smyth Co.*, 2018 WL 3635024, at *3-4 (finding that a company took reasonable steps to maintain confidentiality by keeping the trade secret documents on encrypted servers protected by firewalls to which only some employees had access, and by utilizing a confidentiality policy in its handbook). Thus, Brightview is likely to succeed in establishing that its underwritings are trade secrets.

Second, Brightview claims that its lease-up reports and documents containing lease-up information are trade secrets. Lease-up reports are generated by a password-protected system that is only accessible to certain Brightview personnel, including community executive directors and business office managers. ECF 3-3, ¶ 10. However, community directors and business office managers may only generate lease-up reports for their own communities. *Id.* Third-party consultants "who need the information for their work" are also given access to these reports, but they "operate under confidentiality and ethics standards implicit in the nature of the relationships." *Id.* Lease-up information has high value to a competitor exploring the viability

of markets they are unfamiliar with – if a competitor saw that a market took a short time to lease-up, that is a strong indication of a healthy market for competition. Hrg. Tr. 88:16-22; ECF 3-3, ¶ 10. Further, Brightview does not share the specific lease-up periods for each property with any other competitor. Hrg. Tr. 127:2-128:22. Having considered this evidence, in addition to Defendants' objections, ECF 85 at 20-21, the Court finds that this evidence is sufficient to establish that the lease-up information, associated with each community, is a trade secret.

Third, Brightview claims that its cross-property operating reports are trade secrets. These documents go into extensive detail about every particular nuance of a Brightview community, and its profitability. *See* Digital Ex. C. to Brightview's Supplemental Brief; ECF 3-3, ¶ 11. Defendants argue that this information can be obtained through public subscription sources, which have "detailed spreadsheets of the specific number of units, types of units, and pricing of all competitors within a major markets [sic]." ECF 85 at 24. There is no evidence, however, that these public subscription sources provide the level of detail the cross-property operating reports do. For example, with access to the cross-property operating report for Fiscal Year 2019, the Court was able to determine, within minutes, which of Brightview's thirty properties had the most profitable beauty salon. Perhaps of more importance to a competitor, it took little time for the Court to find the single sheet in the Excel workbook that listed the year-to-date profitability of each Brightview community. The value of this detailed information to a competitor looking to open a community in a same or similar geographical area is evident. *See also* ECF 3-3, ¶ 11. Brightview does not share its cross-property operating reports with anyone, and only a select few individuals within Brightview have access to this information. *Id.* Further, though the files themselves are not password protected, "the location where the files are stored is restricted to the personnel who are permitted to access" them. *Id.* Based on the value of this information to

Brightview and to other competitors, and the reasonable security measures taken to ensure this information's secrecy, Brightview is likely to succeed in demonstrating that their cross-property operating reports are trade secrets. *See AirFacts, Inc.*, 909 F.3d at 96-97; *Motor City Bagels*, 50 F. Supp. 2d at 478-79; *LeJeune*, 381 Md. at 309-10.

ii. *Brightview is likely to succeed in showing that its trade secrets were misappropriated.*

As relevant here, the Defend Trade Secrets Act provides that a trade secret can be misappropriated when a person either (1) acquires a trade secret while knowing, or having reason to know, that the trade secret was acquired by improper means, 18 U.S.C. § 1839(5)(A), or (2) uses or discloses the trade secret after acquiring it through improper means, *id.* § 1839(5)(B)(i). Maryland defines misappropriation in "substantially the same manner." *Md. Physician's Edge, LLC v. Behram*, No. DKC-17-2756, 2019 WL 4573417, at *5 (D. Md. Sept. 20, 2019). *Compare* Md. Code Ann., Com. Law § 11-1201(c) *with* 18 U.S.C. § 1839(5). Thus, a claim for misappropriation lies "simply by demonstrating that the defendant acquired [the] trade secret by improper means, even if the plaintiff cannot show use of that trade secret." *Sys. 4, Inc. v. Landis & Gyr, Inc.*, 8 F. App'x 196, 200 (4th Cir. 2001) (interpreting the MUTSA). The DTSA further provides that the "improper means" of acquiring a trade secret "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6)(A). The MUTSA's definition mirrors the DTSA's definition. *Compare id. with* Md. Code Ann., Com. Law § 11-1201(b).

Brightview has demonstrated a likelihood to succeed on its misappropriation of trade secrets claims. First, as to the underwritings, Brightview has adduced evidence that Teeters both acquired them through improper means, and used the underwritings after having acquired them through improper means. The Court does not doubt that, in the course of Teeters's employment

with Brightview, he had access to Brightview underwritings. But when, as a Brightview employee, he downloaded those underwritings for the purpose of furthering his own budding senior living community development venture, Teeters misappropriated those documents. *See Md. Physician's Edge*, 2019 WL 4573417, at *5-6. Teeters further misappropriated the underwritings by sending them to third parties unrelated to Brightview, while changing only a minimal number of data points in the spreadsheet. When Teeters downloaded those underwritings, he knew he had a duty to keep them secret, but he disregarded that duty by sending the underwritings to the third parties, and even encouraging the third parties to continue passing them along. These actions constitute misappropriation under federal and state law. *See Ameritox, Ltd. v. Savelich*, 92 F. Supp. 3d 389, 403 (D. Md. 2015) (finding that misappropriation occurred where the plaintiff provided evidence that the defendant was using the plaintiff's trade secrets to help "build its own database"); *see also, e.g.*, *Md. Metals, Inc. v. Metzner*, 282 Md. 31, 46 (1978) (noting that an employee, in competing with his former employer, may utilize only "general experience, knowledge, memory and skill – as opposed to specialized, unique or confidential information gained as a consequence of his employment"); *Plains Cotton Coop. Ass'n of Lubbock, Tex. V. Goodpasture Computer Serv., Inc.*, 807 F.2d 1256, 1263 (5th Cir. 1987) (same).

Similarly, Brightview is likely to show that Dingman misappropriated Brightview's trade secret cross-property operating reports. Dingman claims that he downloaded the reports because he was asked to help with Brightview's upcoming budgetary process. ECF 9-1, ¶¶ 13-14. However, Dingman's claim is controverted by the evidence. First, while Dingman would have been involved in the budgeting process for 2020, Brightview's corporate designee testified that, as a regional director, Dingman would have only been responsible "for either drafting personally

or overseeing the drafting of the business plans for his eight communities." ECF 85-3 at 94:1-11; *see also id.* at 93:3-20. There has been no evidence to show that Dingman would have needed a document like Brightview's cross-property operating reports, detailing the profits and losses of all thirty Brightview communities, to fulfill his responsibility as to his eight communities. Second, Dingman saved the cross-property operating reports to a folder in his drive entitled "New Business," further demonstrating an intent to use the reports for personal, non-Brightview reasons. ECF 3-5 at 11 (noting that the file path for the cross-property operating report was "D:\New Business\Misc\Copy of Cross_Prop_rpt_with KPI_June_19.xlsx").

Brightview is therefore likely to succeed in showing that Dingman misappropriated Brightview's cross-property operating reports by downloading them for future personal use, without any legitimate Brightview business purpose. *See Md. Physician's Edge*, 2019 WL 4573417, at *5-6; *LeJeune*, 381 Md. at 314-15 (holding, under the MUTSA, that transferring files to a personal computer for future personal use is misappropriation). *Compare with Diamond v. T. Rowe Price Assocs., Inc.* 852 F. Supp. 372, 412 & n.193 (D. Md. 1994) (finding that the defendant-former employee's possession of documents was not misappropriation, since the plaintiff sent the defendant home with those documents for work purposes during defendant's employment with the plaintiff).

Finally, Brightview is likely to show that Dingman and Monarch continue to misappropriate Brightview's trade secret lease-up information. At the hearing, Brightview produced a marketing booklet that Monarch curated, that contains not only pictures of Brightview communities, but also bios of Teeters, Dingman, and Glynn. Hrg. Ex. 40 at MONARCH00140-46. Included in Dingman's profile is a list of each Brightview community he oversaw in his tenure, and the exact number of months each took to lease-up to 94%

occupancy.  *Id.* at MONARCH00146.  Indeed, Dingman testified at his deposition that, moving forward, "I will share information that's relevant to my work experience and that's all I will share. . . . If someone asks me how quickly I leased up a community, I might share that."  ECF 86-5 at 71:11-21 (Dingman Dep., Jan. 13, 2010).

At the hearing, Dingman testified that he would not need to reference the "Community Openings" document to know how long it took twenty-eight of the thirty communities he oversaw to lease-up.  Hrg. Tr. at 173:2-5 ("You'll see two of [the lines] are blank that I didn't actually know; I had to go and look at an occupancy statement to see when they actually reached [94% occupancy].  But those numbers are actually in my head.").  Even setting aside doubts about Dingman's ability to memorize the precise number of months it took for twenty-eight communities to fully lease-up over a twenty-five-year timespan, Dingman's memorization ability is immaterial.  If a person leaves the Coca-Cola Company after having memorized the formula for Coca-Cola®, that does not give him license to transmit the prized soft drink's recipe to PepsiCo.  Dingman is free to promote the qualities that make him a successful senior living community developer, but not at the expense of Brightview trade secret information.  *See, e.g.*, *Md. Metals*, 282 Md. at 46.  Likewise, Monarch cannot use that trade secret information to promote the abilities of one of its managing partners.

Thus, Brightview has demonstrated a likelihood of success in establishing that each Defendant misappropriated a Brightview trade secret document.[5]

---

[5] The fact that the Court has not discussed whether each document that Brightview has claimed as trade secret, *see* ECF 58, is in fact trade secret, is not a reflection of the Court's views on the merits of Brightview's claims.  Rather, at this stage, it need only be shown that Brightview is likely to succeed as to some subset of the large number of documents Brightview claims to be trade secrets.

2. <u>Brightview has demonstrated a likelihood of success on its unfair competition claim.</u>

Brightview is also likely to succeed in showing that Defendants have engaged in unfair competition. In the seminal case *Baltimore Bedding Corp. v. Moses*, the Maryland Court of Appeals explained that this common law action exists because "no one . . . is justified in damaging or jeopardizing another's business by fraud, deceit, trickery, or unfair methods of any sort." 182 Md. 229, 236-37 (1943). The Court of Appeals continued:

> What constitutes unfair competition in a given case is governed by its own particular facts and circumstances. Each case is a law unto itself, subject, only, to the general principle that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception.

*Id.* at 237. The tort "is not limited to 'passing off' one's goods as those of a competitor," *Delmarva Sash & Door Co. of Md., Inc. v. Andersen Windows, Inc.*, 218 F. Supp. 2d 729, 733 (D. Md. 2002), but instead applies to "all cases of unfair competition in the field of business," *Balt. Bedding Corp.*, 182 Md. App. at 236-37.

"Though this tort is susceptible to a broad interpretation, the courts must be careful to guard against extending the meaning of unfair competition to cover acts which may be unethical yet not illegal." *Elliott Dredges, LLC v. DSC Dredge, LLC*, 280 F. Supp. 3d 724, 732 (D. Md. 2017) (alterations and quotations omitted) (quoting *Edmonson Village Theatre v. Einbinder*, 208 Md. 38, 48 (1955). At the same time, however, "Maryland case law has never required an unlawful act as an essential element of an unfair competition claim." *Trimed, Inc. v. Sherwood Med. Co.*, 977 F.2d 885, 891 (4th Cir. 1992). "The legal principles which are controlling here are simply the principles of old-fashioned honesty. One man may not reap where another has sown, nor gather where another has strewn." *GAI Audio*, 27 Md. App. at 192 (citation omitted). Acts that can constitute unfair competition include those that "substantially interfere[] with the

ability to compete . . . or conflict[] with accepted principles of public policy." *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F. Supp. 2d 675, 691 (D. Md. 2012) (quoting Restatement (Third) of Unfair Competition § 1 (1995)). If unfair business practices are present, then "equity will grant protection against the offending party." *Balt. Bedding Corp.*, 182 Md. at 237.

Applying these standards, Brightview has supplied ample evidence to justify its request for injunctive relief. The current record is rife with evidence that Dingman and Teeters used Brightview proprietary and confidential information, while they were still employed by Brightview, to begin a competing senior living business with Michael Glynn. *E.g.*, ECF 69-7 (September 29, 2018 email exchanging an underwriting between Teeters, Glynn, and Dingman, which was to be forwarded to a potential investor); ECF 69-9 (September 30, 2018 email from Teeters to investor, forwarding the September 29 underwriting); ECF 69-10 (October 27, 2018 email, in which Teeters forwards to a different investor the same information sent on September 30); ECF 69-14 (National Development Mid-Atlantic Market Opportunities, which is a near duplicate of Brightview's same presentation); *see also* ECF 69-16 to -28, ECF 69-32 (other emails between Teeters, Dingman, and Glynn, many of which involve potential investors).

This is not a case in which Teeters, Dingman, and Monarch have used publicly available documents, which would favor against an unfair competition claim. *See Paccar Inc.*, 905 F. Supp. 2d at 692. Instead, Brightview is likely to succeed in showing that Defendants have leveraged access to sensitive Brightview business information in an effort to "jump-start" their own senior living community development business.

During the last year of their employment with Brightview, Teeters and Dingman downloaded to their personal drives Brightview heat maps, demographic analyses, pricing sheets, underwritings, accrual accounting statements, lease-up pace reports, cross-property operating

reports, and Brightview's Operating Agreement and Operational Guidelines.  ECF 3-5, Ex. A;

ECF 58 (Brightview's Revised Compilation of Trade Secret and Confidential Documents).  For

the following categories of documents in Brightview's Revised Compilation, ECF 58, that the

Court has not already deemed as likely to be trade secret, Brightview is likely to establish that

those documents have some economic value to competitors, and are not entirely in the public

domain, such that they are properly considered to contain, at minimum, confidential and

proprietary Brightview information:

| Document (*see* ECF 58) | Evidentiary Support |
|---|---|
| **Project Pipeline** – Doc. No. 10, ECF 58 | Hrg. Tr. 89:11-95:8; ECF 69-11. |
| **Historic Deal Summary** – Doc. No. 12, ECF 58 | ECF 69-17 (Glynn email to Kevin Kelly, noting that the document contains "lease-up performance" information) |
| **Heat Maps** – Doc. Nos. 13-15 | Hrg. Tr. 95:17-97:8; ECF 69-29; ECF 3-3, ¶ 24 |
| **Pricing Sheets** – Doc. No. 16 | Hrg. Tr. 41:22-43:7; ECF 69-36; ECF 3-3, ¶ 6 |
| **Operational Manual** – Doc. No. 17 | Hrg. Tr. 44:18-46:15; Hrg. Ex. 41; ECF 3-3, ¶ 7 |
| **Operating Agreements** – Doc. Nos. 30-31 | ECF 3-3, ¶ 15; ECF 69-41 |
| **Accrual Accounting Statements, P&L Statement for Management Company** – Doc. Nos. 32-33 | Hrg. Tr. 43:9-44:17; ECF 69-37; ECF 3-3, ¶¶ 16-17. |
| **Systems Training Curricula** – Doc. Nos. 34-40 | ECF 3-3, ¶ 19 |
| **Brightview Equity Funds Summary** – Doc. No. 46 | ECF 3-3, ¶ 18 |
| **Demographic Analyses** – Doc. Nos. 47-55, 60-65 | ECF 3-3, ¶¶ 9, 23; ECF 69-14 (the National Development Mid-Atlantic Market Opportunities presentation, which contains a number of Brightview demographic analyses) |

However, as to document numbers 43, 44, 45, 56, 57, 58, and 59 in Brightview's Revised

Compilation, ECF 58, this Court has no evidence regarding what these documents are, or what

information they contain.  Accordingly, the Court cannot reach a conclusion as to whether those

documents contain proprietary or confidential information.  Further, the Court does not discern

any proprietary value in the training checklists, document numbers 26, 27, 28, and 29, as they

largely contain only a summary of the training that is necessary to satisfy the relevant government regulations. *See* ECF 69-40 (Brightview's annual training checklist for New Jersey properties). Finally, Brightview has abandoned its claims as to document numbers 41 and 42. *See* ECF 81 at 2. These documents, and their alleged use, therefore play no role in the Court's analysis.

Of the trade secret and proprietary documents Defendants downloaded onto their personal drives, most contain file paths indicating that they were not downloaded for Brightview business purposes. For example, Teeters saved the vast majority of Brightview demographic analyses he downloaded to a folder in his personal drive called "Stebbins," and Dingman saved those same documents to a folder in his personal drive called "New Business." ECF 3-5 at 12-13. Defendants also used many of these documents, as well as Brightview's trade secret documents, in their efforts to obtain capital throughout early 2019, while Teeters and Dingman were both still employed by Brightview. *See* ECF 69-7, 69-9 to -10, 69-17 to -27, 69-31 to -32. Additionally, there is evidence that Defendants have incorporated Brightview trade secret and proprietary information into documents bearing the Monarch name, creating "Monarch morphs." ECF 69-14 (the National Development Mid-Atlantic Market Opportunities presentation); Hrg. Ex. 40 (the Monarch-ProCon marketing material, which contains the precise lease-up time for each Brightview community Dingman opened while employed with Brightview). These actions are the precise type of deceptive and dishonest business practices that the common law action of unfair competition is designed to reach. Accordingly, Brightview is likely to succeed in establishing that Defendants have engaged in unfair competition, as defined under Maryland common law.

**B.  Brightview has suffered, and will continue to suffer, irreparable harm.**

Brightview has also demonstrated that it will likely suffer irreparable harm absent an injunction.  This Court may only issue an injunction if Brightview can show that it is "likely to suffer irreparable harm before a decision on the merits can be reached."  *Winter*, 555 U.S. at 22. This irreparable harm must be "neither remote nor speculative, but actual and imminent."  *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1992) (citation omitted). "[H]arm is not 'irreparable' if it can be compensated by money damages." *Person v. Mayor & City Council of Baltimore*, 437 F. Supp. 2d 476, 479 (D. Md. 2006) (citing *Hughes Network Sys. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994)).  Conversely, "when the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable harm injury prong is satisfied." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994), *abrogated on other grounds by Winter*, 555 U.S. 7.  However, the Maryland Court of Appeals has denounced the issuance of injunctions under the "inevitable disclosure" theory of irreparable harm.  *See LeJeune*, 381 Md. at 322-23.  That is, Brightview cannot obtain injunctive relief under the MUTSA merely because, by the nature of working in a competing venture, Teeters and Dingman will "inevitably be required to use or disclose [Brightview's] trade secrets in order to perform [their] new job."  *Id.* at 317 (citation omitted).

Defendants first assert that Brightview will suffer no irreparable harm because Defendants have divested themselves of all access to the Brightview documents they downloaded onto their personal storage devices.  ECF 85 at 34-35.  To this effect, at the hearing, Defendants provided the testimony of Philip Depue, an employee of Sensei.  Mr. Depue testified that he permanently deleted emails from the accounts of Teeters, Dingman, Glynn, Stebbins, and

one Mr. Anderson. Hrg. Tr. 191:22-192:3, 193:24-194:4, 194:23-195:4. Mr. Depue received a set of emails from an e-discovery vendor, and from an attorney representing Anderson and Stebbins, and deleted all emails in each account "that matched the characteristics, had the same titles, subject line, contents, [and] attachments" as those on the lists provided by Defendants' counsel. *Id.* at 194:5-195:4. Mr. Depue also noted that he preserved all of the emails before deleting them. *Id.* at 195:12-15. According to Defendants, "Without access to the emails or the drives with the documents, there is no possibility of use or disclosure of the Plaintiff's information by Defendants." ECF 85 at 35.

In rebutting Defendants' argument, Brightview cites to *Teksystems, Inc. v. Spotswood*, No. RDB-05-1532, 2005 WL 8174397 (D. Md. June 29, 2005). In that case, United States District Judge Richard D. Bennett issued injunctive relief in favor of Teksystems against a former employee, Spotswood, who was working for a Teksystems competitor in violation of a provision of his employment agreement that contained a non-disclosure covenant. *Id.* at *2-3, *5-8. As relevant here, Judge Bennett found that Spotswood's use of Teksystem's confidential and proprietary information to solicit business for his new employer constituted irreparable harm. *Id.* at *5. Judge Bennett pointed out that "[c]ourts have recognized that the potential for the loss of trade secrets . . . demonstrates irreparable harm because '[a] trade secret once lost is, of course, lost forever.'" *Id.* (quoting *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) (per curiam)).

The Second Circuit's language in *FMC Corp.* spawned a genus of case law in that Circuit holding that, if a plaintiff showed a likelihood of success on the merits of its trade secret misappropriation claim, then the court could automatically presume irreparable harm. *E.g.*, *Ivy Mar Co. v. C.R. Seasons, Ltd.*, 907 F. Supp. 547, 567 (E.D.N.Y. 1995). In 2009, the Second

Circuit clarified that this reading of *FMC Corp.* was "not correct." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 118 (2d Cir. 2009). The Second Circuit explained that a rebuttable presumption of irreparable harm "might be warranted in cases where there is a danger that, unless enjoined," a defendant will continue to disseminate already misappropriated trade secrets, "or otherwise irreparably impair the value of those secrets." *Id.* Where the misappropriating defendant only threatened to use those secrets himself, then no presumption would be warranted. *Id.* at 119.

The Second Circuit's holding in *Faiveley Transport* aligns it with other courts that employ a rebuttable presumption of irreparable harm in trade secret misappropriation cases. *See, e.g.*, *Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1143-44 (N.D. Ill. 2019) (applying a rebuttable presumption in an action brought under the DTSA and the Illinois Trade Secrets Act); *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, No. 4:06CF114, 2010 WL 3370286, at *2 (N.D. Ohio Aug. 26, 2010) ("Courts in the 6th Circuit have stated only that harm caused by the misappropriation of trade secrets is generally irreparable and may be presumed in some cases." (citations omitted)). Other courts, however, apply no presumption, and require a showing of irreparable harm in each case of trade secret misappropriation. *E.g.*, *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1142-44 (10th Cir. 2017) (explaining that because the DTSA only permits, and does not mandate, injunctive relief, courts could not presume irreparable harm in considering a request for preliminary injunctive relief post-*Winter*); *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91-93 (3d Cir. 1992) ("A threat of disclosure may establish immediate irreparable harm[,] but 'further' disclosure of something already revealed cannot.").

While the Fourth Circuit has not affirmatively staked a position on this precise issue, it appears to require an individualized analysis of irreparable harm on a case-by-case basis. For instance, in *Direx Israel*, the Fourth Circuit reversed the district court's finding of irreparable harm in issuing a preliminary injunction. 952 F.2d at 815-16. The Fourth Circuit reasoned that the defendant company, who was alleged to have misappropriated the plaintiff's trade secrets in a medical device the defendant constructed and intended to sell, was "completely immobilized" from engaging in sales the infringing machine, because the FDA and U.S. Customs had not approved the machine's sale in foreign and domestic markets. *Id.* at 804, 815-16. This meant that the harm to the plaintiff from the defendant's sales of the machine – both within and outside the United States – was "at least a year down the road, maybe two or three years." *Id.* at 816. Because of this, the court held that "any direct harm to [the plaintiff]" was "problematical and uncertain," rendering preliminary injunctive relief inappropriate. *Id.* at 815-16.

With regards to the Maryland Uniform Trade Secrets Act, the Maryland Court of Appeals has explicitly held that past disclosures of trade secrets are insufficient to justify preliminary injunctive relief in a misappropriation case. *LeJeune*, 381 Md. at 315. Injunctive relief, the court explained, "addresses only what could happen in the future and cannot remedy misconduct . . . that occurred in the past." *Id.* Looking to the language of the MUTSA, which provides for injunctive relief for "[a]ctual or threatened misappropriation," Md. Code Ann., Com. Law § 11-1202(a), the Court of Appeals held,

> the injunctive remedies of Section 11-1202(a) of MUTSA provide no remedy at all for the past misappropriations. In other words, if LeJeune already had misappropriated the trade secrets and returned them, the court cannot craft an injunction to reverse time and erase whatever harm LeJeune caused by taking the trade secrets without consent.

381 Md. at 315.

Defendants contend that much of Brightview's evidence relies on past instances of disclosure of its trade secrets by Teeters and Dingman. Both Defendants testified at the hearing that they have no intent, moving forward, to use or access Brightview's documents they misappropriated or otherwise retained after their departures from Brightview. Hrg. Tr. 145:9-147:25 (Teeters); *id.* at 182:1-186:9 (Dingman). Both have also testified under oath that none of that information has been used or repurposed for Monarch. *Id.* at 182:14-18 (Dingman); *id.* at 205:6-15 (Teeters).

However, evidence adduced during the limited expedited discovery period undercuts Defendants' assertions. First, the Court is unconvinced that Teeters and Dingman do not intend to use any of the information contained in the Brightview documents moving forward. At his deposition, Dingman admitted that he and Teeters used the Brightview underwriting template because "it saved some time." ECF 86-1 at 278:1-3 (Dingman Dep., Jan. 3, 2020). Dingman was also noncommittal about whether he would disclose and/or use Brightview information moving forward. With regards to lease-up information, Dingman testified, "I will share information that's relevant to my work experience and that's all I will share. . . . If someone asks me how quickly I leased up a community, I might share it." ECF 86-5 at 71:11-21. Dingman and Brightview's counsel also had the following exchange regarding Dingman's downloading thirty-nine pricing sheets in the span of six days in July, 2019:

> Q:   As you sit here, is it your sworn testimony that in downloading these 40 [sic] pricing sheets in July, you had no intention of using any of this information for your competitive business, be it Monarch or otherwise?

> A:   I can say it was not my intention. If I had information available to me, would I? Maybe.

ECF 86-1 at 347:14-20.

Second, with regards to Teeters's and Dingman's assertions that they have not repurposed Brightview information for Monarch, those assertions are provably false. The Monarch marketing piece, for example, clearly displays the lease-up information for almost all of the twenty-eight Brightview communities that Dingman helped to open in his time with Brightview. Hrg. Ex. 40 at MONARCH00146. Further, though not trade secret or otherwise confidential information, the piece prominently features pictures of two Brightview communities on the cover page and the table of contents page. *Id.* at MONARCH00140-41; Hrg. Tr. 189:10-25. Monarch has also previously utilized a Brightview market analysis presentation as its own, in order to garner more investor interest, ECF 69-14, and created a mirror copy of a product development guide that Brightview developed over the course of a year-long intensive focus group, ECF 69-42, -43.

Of course, these are not the only instances in which Defendants used Brightview confidential or proprietary information for their own business purposes. Indeed, Brightview has provided over twenty emails in which Defendants either exchanged Brightview information between themselves and Glynn, or sent that information to third-party investors in order to secure capital for their growing venture. ECF 69-7, 69-9 to -10, 69-17 to -27, 69-31 to -32. The evidence demonstrates a pattern of Defendants, having ready access to Brightview's trade secret and other proprietary information, not only being tempted to utilize that information, *see* ECF 69-1 at 347:14-20, but freely doing so.

The fact that Defendants have undertaken an effort to delete purportedly all of the emails containing Brightview information, and have surrendered their personal flash drives, does not eliminate the risk of future use. If Teeters and Dingman are correct that they have committed Brightview trade secrets and/or proprietary information from the contested Brightview

documents to memory, that information remains accessible to them, despite the emails' deletion.[6] *See, e.g.*, Hrg. Tr. at 173:2-5 (Dingman testifying that he memorized the precise lease-up period for all but two of the Brightview communities he oversaw). Further, given the fungibility of electronic documents and the fact that there already exist some "Monarch morphs," or Monarch documents containing Brightview trade secret and/or proprietary information from the Brightview documents at issue, the Court is persuaded that additional "Monarch morphs" will continue to be used moving forward. Thus, there still exists a "cognizable danger of [a] recurrent violation" by Defendants, such that injunctive relief is still required. *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *see ClearOne Commc'ns, Inc. v. Chiang*, 608 F. Supp. 2d 1270, 1279-81 (D. Utah 2009) (holding that the defendants' assertions that they stopped using the plaintiff's trade secrets did not eliminate the imminent threat of irreparable harm to the plaintiff, and that continued use of the plaintiff's trade secrets would damage the plaintiff's competitive market position). Accordingly, Brightview has met its burden to demonstrate that it will likely continue to suffer harm moving forward.

The harm that Brightview will likely suffer is actual and imminent. Monarch has engaged with at least seven sources of capital funding, and remains in ongoing discussions with all but one of them. Hrg. Tr. 153:3-13; ECF 86-2 at 186:12-187:7. In fact, National Development – Glynn's former employer, and the current employer of Mr. Brian Kavoogian (one of the people Teeters sent a copy of the misappropriated Ellicott City underwriting template

---

[6] This is not to say that Teeters and Dingman cannot use, or advertise, the general knowledge and experience they have gained in their years working in the senior living industry. "[A]n employee enjoys a right, in competing against his former employer, to utilize general experience, knowledge, memory and skill – as opposed to specialized, unique or confidential information – gained as a consequence of his employment." *Md. Metals*, 282 Md. at 46. For example, while Dingman could not provide a prospective investor with the exact number of months it took him to lease-up Brightview Tarrytown, he could more generally advertise to investors that he successfully "leased-up [*x* number of] communities in under [*x*] months."

to, *see* ECF 69-9) – "really liked" what they heard from Defendants, and may fund a Monarch project if it makes business sense to do so. ECF 86-3 at 59:6-9; Hrg. Tr. 152:16-18. While Defendants may not be ready to close on a property in the imminent future, Defendants' efforts to find a profitable venue for a senior living community, and advertise themselves to potential investors, remain active and ongoing. The record establishes Defendants' consistent use of Brightview information to further these efforts.

Finally, the harm that Brightview is likely to suffer during the pendency of litigation is irreparable. Defendants have shown a pattern of divulging Brightview trade secret and proprietary information to others interested in developing senior living communities, and their efforts to obtain more capital investors remain ongoing. Of course, an injunction cannot remedy the harm caused by past disclosures of the Brightview information. But allowing Defendants to continue the *status quo* and divulge trade secret and/or proprietary information that they believe is theirs to freely share will likely cause Brightview further harm that the Court could not otherwise remedy, such as the irreversible loss of other Brightview trade secrets that have not yet been disclosed, and the loss of its competitive market position. *See, e.g.*, *ClearOne Commc'ns*, 608 F. Supp. 2d at 1279-81; *Neo Gen Screening, Inc. v. TeleChem Int'l, Inc.*, 69 F. App'x 550, 554-55 (3d Cir. 2003) (noting that the threat of future disclosure of trade secrets results in irreparable harm). Indeed, viewing this case from the point of view of Brightview's unfair competition claim, "the scheme is more than unfair competition; it amounts to an actual appropriation of the plaintiff's property by the defendants to their own business purposes. A court of equity ought not to hesitate long to interpose its protection against a scheme of this character." *GAI Audio*, 27 Md. App. at 193 (quoting *Nat'l Broad. Co. v. Nance*, 506 S.W.2d 483, 485 (Mo. Ct. App. 1974)).

In sum, Brightview has provided sufficient evidence for the Court to conclude that Brightview will likely suffer imminent, irreparable harm absent preliminary injunctive relief. Accordingly, the Court proceeds to consider the final two factors necessary for the issuance of a preliminary injunction.

### C.   The balance of the equities falls in Brightview's favor, and issuing a preliminary injunction in this case is in the public interest.

The final two factors for issuing preliminary injunctive relief fall in Brightview's favor. First, the balance of the equities favors Brightview. As discussed above, Brightview faces the prospect of suffering irreparable harm through the continued disclosure of its trade secrets, and through Defendants' wrongful utilization of Brightview's confidential and proprietary information to jump-start their own business, which heavily favors injunctive relief. *See, e.g.*, *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 894 F. Supp. 2d 691, 708 (E.D. Va. 2012) ("[T]he continued use of a purloined trade secret is a harm of significant measure that warrants injunctive relief."), *overruled on other grounds*, 564 F. App'x 710, 712-13 (4th Cir. 2014) (remanding for a new trial due to an erroneous ruling on a pretrial motion in limine).

Defendants, meanwhile, have produced no evidence of any harm that they will suffer if the Court enjoins them from using Brightview information during the pendency of the litigation. If Defendants truly have no intent to use Brightview trade secret or proprietary information going forward, then enjoining their further use of Brightview information will not cause them any harm. Instead, during the hearing, Defendants' counsel intimated that the harm to Defendants comes in the form of the stigma an injunction places upon their future business operations:

> THE COURT:   [W]hat evidence do I have about the harm that [an injunction] would cause versus the harm that's already accrued from the lawsuit? I don't think I have anything in front of me sort of distinguishing those two things or suggesting that the injunction would impose any additional harm than the lawsuit already does.

COUNSEL:    You're right, Your Honor, in terms of evidence, I don't have any evidence on it.  I think it's probably just a common sense argument . . . look, if our clients were engaging a potential partner and understood that partner was subject to a lawsuit, they may pause and question and say, well, wait a second, let's think about this.  Different people have different reactions.  But an injunction, it says more.

Hrg. Tr. 229:4-17.  However, "[D]efendants' hardships have been created by their own willful acts." *NaturaLawn*, 484 F. Supp. 2d at 403.  This "self-inflicted" harm is not enough to tip the equities in their favor.  *Id.*; *see also Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1229 (10th Cir. 2007) ("[W]hen the case for infringement is clear, a defendant cannot avoid a preliminary injunction by claiming harm to a business built upon that infringement."); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) ("[T]he injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself.").  Further, the preliminary injunction considered here only restrains Defendants from using misappropriated Brightview trade secret and proprietary information while operating their competing business.  It does not enjoin Defendants from participating in the senior living industry wholesale.  Under these facts, the equities strongly favor Brightview.

Finally, the public interest favors the protection of trade secrets, and the prevention of unfair business practices.  *See NaturaLawn*, 484 F. Supp. 2d at 404 (noting that it is in the public interest "to validate . . . the proprietary nature of trade secrets").  While the public certainly has an interest in promoting free market competition in a capitalist economy, that interest is not protected unless the legal system "prevent[s] unethical business behavior" and stops market participants from driving "another competitor out of business by unfairly misappropriating trade secrets" and other confidential business information.  *See Advanced Instructional Sys., Inc. v.*

*Competentum USA, Ltd.*, No. 1:15CV858, 2015 WL 7575925, at *6 (M.D.N.C. Nov. 25, 2015) (citations omitted); *see also GAI Audio*, 27 Md. App. at 192.

In sum, Brightview has demonstrated a likelihood of success in establishing that Defendants have violated the Defend Trade Secrets Act and the Maryland Uniform Trade Secrets, and are liable for unfair competition. Brightview has also demonstrated that it is likely to suffer immediate, irreparable harm without preliminary injunctive relief. Because the balance of the equities favors Brightview, and issuing a preliminary injunction is in the public interest, the Court will grant Brightview's request for a preliminary injunction.

### D. The scope of Brightview's injunctive relief.

Having determined that Brightview is entitled to preliminary injunctive relief, the Court must ascertain the proper scope of the injunction. Federal Rule of Civil Procedure 65(d) provides that every order granting an injunction provide (1) the reasons for the injunction, (2) the specific terms of the injunction, and (3) a description in "reasonable detail" of the act(s) restrained or required. These requirements "are mandatory." *Alberti v. Cruise*, 383 F.2d 268, 271-72 (4th Cir. 1967).

Brightview's briefing on this issue initially requested an injunction that enjoined Defendants from "using or disclosing Brightview Information for any purposes related to senior living ventures," providing a specialized definition of the term "Brightview Information." ECF 86 at 5 n.1, 9-10. After the hearing, Brightview, to its benefit, filed a Proposed Order that narrowed the scope of its requested injunction to only those documents Brightview currently contends are trade secrets, or are otherwise confidential or proprietary business information. *See* ECF 81; ECF 81-1. Brightview proposes that Defendants be enjoined "from accessing, using, disclosing, or disseminating" the documents referenced in an appendix to the Order. The Court

agrees that this language satisfies the demands of Rule 65(d), and is appropriately tailored to the nature of the harm Brightview stands to incur absent preliminary injunctive relief. *See Ciena Corp. v. Jarrard*, 203 F.3d 312, 321-22 (4th Cir. 2000) (finding that an injunction restraining the defendant from "using, disclosing, or otherwise misappropriating any of [plaintiff's] trade secrets or confidential information" satisfied the demands of Rule 65(d)).

Defendants lodge several objections to the preliminary injunction order. First, they argue that the scope of the order is problematic because they do not have access to many of the documents at issue. ECF 82, ¶¶ 2-5. For the reasons enumerated above in the Court's discussion of irreparable harm, however, this argument lacks merit.

Second, Defendants argue that a large number of documents are improperly included in the order, because "Defendants do not believe [that] the Court received any documentary evidence at the preliminary injunction hearing" as to those documents. *Id.* ¶ 6; *see id.* ¶ 7 (listing each challenged document). For the reasons stated in Part III.A.2, *supra*, the Court agrees that those documents do not contain confidential or proprietary Brightview information, and those for which the Court has no evidence as to their contents, are not properly within the scope of the injunction. The Court's Order will therefore not include document numbers 26, 27, 28, 29, 41, 42, 43, 54, 55, 56, and 57, as listed in Attachment A to ECF 81-1. However, because there is sufficient evidence in the record as a whole as to the trade secret or proprietary nature of the other documents, Defendants' remaining objections, ECF 82, ¶ 7, lack merit.

Third, Defendants argue that a number of the documents should not be included in the order because they are not ones that Brightview contends are trade secrets. ECF 82, ¶ 9. This argument is misplaced. Brightview has demonstrated a likelihood of success on the merits of its common law unfair competition claim. Accordingly, the Court deems it appropriate to include in

the scope of preliminary injunctive relief those documents that give Defendants an unfair competitive advantage, because they are proprietary Brightview documents. Allowing Defendants to continue using the information contained in proprietary Brightview documents would still, as outlined above, contribute to the irreparable harm Brightview is likely to suffer.

Finally, Defendants object to paragraphs 3(b) and (c) of the proposed order, which applies the injunction to "[t]he officers, agents, employees, and attorneys of Defendants," as well as "[o]ther persons who are in active concert or participation with anyone described in Sections 3(a) and (b) of this Order." ECF 82, ¶ 11; *see* ECF 81-1, ¶ 3. Defendants argue that this is impermissibly broad, because an injunction cannot reach a party's attorneys, or "other persons who are in active concert or participation" with the parties. ECF 82, ¶ 12. To the contrary, Federal Rule of Civil Procedure 65(d)(2) provides:

> *Persons Bound.* The order binds only the following who receive actual notice of it by personal service or otherwise:
> (A) the parties;
> (B) the parties' officers, agents, servants, employees, and attorneys; and
> (C) *other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).*

(emphasis added). Brightview's proposed order mirrors this language. *See* ECF 81-1, ¶ 3. Defendants' objection is baseless.

### E. Brightview must post a bond of $10,000.

Federal Rule of Civil Procedure 65(c) provides that no preliminary injunction can be issued unless the party awarded injunctive relief is required to post a bond in a sum that "the court deems proper." The bond shall secure "the payment of such costs and damages as may be incurred or suffered" by the enjoined party if a later court deemed them "wrongfully enjoined." *Id.* The bond requirement "is mandatory and unambiguous." *District 17, UMWA v. A&M Trucking, Inc.*, 991 F.2d 108, 110 (4th Cir. 1993). Thus, a district court commits legal error if it

fails to require a bond upon issuing preliminary injunctive relief.  *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999).  The determination of the precise amount to be posted as a bond, however, rests in the Court's discretion.  *Id.*

In a footnote, the *Hoechst Diafoil* court expanded on the purpose of the bond requirement, and what a court should consider in determining the bond amount.  *Id.* at 421 n.3.  The Fourth Circuit stated that the Court "should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction."  *Id.*  The bond amount, therefore, "ordinarily depends on the gravity of the potential harm to the enjoined party."  *Id.*  The court continued:

> [T]he judge usually will fix security in an amount that covers the potential incidental and consequential costs as well as either the losses the unjustly enjoined or restrained party will suffer during the period he is prohibited from engaging in certain activities or the complainant's unjust enrichment caused by his adversary being improperly enjoined or restrained.

*Id.* (quoting 11A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2954 (2d ed. 1995)).  Thus, if the court finds that the risk of harm to the enjoined party is "remote," then "a nominal bond may suffice."  *Id.* (citing *Int'l Controls Corp. v. Vesco*, 490 F.2d 1334 (2d Cir. 1974)).

Damages under an injunction bond will not be awarded "unless it can be shown that the plaintiff prosecuted the suit maliciously and without probable cause."  *E.g.*, *Greenwood County v. Duke Power Co.*, 107 F.2d 484, 488 (4th Cir. 1939).  The damages that a party claims under an injunction bond "must arise from the operation of the injunction itself, not from damages occasioned by the suit independently of the injunction."  *CVI/Beta Ventures, Inc. v. Custom Optical Frames, Inc.*, 893 F. Supp. 508, 525 (D. Md. 1995) (citing *Lever Bros. Co. v. Int'l Chem. Workers Union*, 554 F.2d 115, 120 (4th Cir. 1976)).  Moreover, the damages a party claims as

lost business profits that are "contemplated but not established are too remote and speculative to form the basis of an award of damages" arising from an injunction's operation. *Greenwood County*, 107 F.2d at 488.

In cases of trade secret misappropriation and violations of non-compete agreements, courts often award a bond of some sort. *See Philips Elecs. N. Am. Corp. v. Hope*, 631 F. Supp. 2d 705, 724 & n.14 (M.D.N.C. 2009) (awarding a $100,000 security after enjoining a defendant-former employee from working for a competitor and from disclosing plaintiff-former employer's confidential information); *Teksystems*, 2005 WL 8174397, at *7 (awarding a bond of $125,000 after enjoining a former employee him from using his previous employer's trade secrets for another competitor); *Rockford Mfg., Ltd. v. Bennet*, 296 F. Supp. 2d 681, 691 (D.S.C. 2003) (awarding, without discussion, a $200,000 bond in case involving former employee's violation of a non-disclosure and non-compete agreement); *Merck & Co. Inc. v. Lyon*, 941 F. Supp. 1443, 1463-64 (M.D.N.C. 1996) (awarding a $5,000 bond in trade secret action arising under North Carolina law, even though Court agreed with the plaintiff that defendant had provided no evidence of harm from injunction). There is precedent, however, for the issuance of a nominal bond in trade secret misappropriation cases under appropriate circumstances. *See Neo Gen Screening*, 69 F. App'x at 556-57 (affirming a district court's award of a nominal bond after issuing a preliminary injunction in a trade secret misappropriation case because the enjoined party "produced no evidence of any irreparable harm to it from the injunction"); *Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1098 (E.D. Cal. 2012) (awarding a nominal bond where enjoined employee was merely barred from contacting specific customers with whom he had contact for a previous employer, allowing the employee to keep his employment).

Here, as explained above, Defendants have shown no evidence of a likelihood of harm. Their only contention is that a single project can generate from $10 to $20 million in revenue, with "[n]et operating margins fall[ing] in the upper 30% to lower 40% range." ECF 85 at 38-39. But Monarch, Teeters, and Dingman are free to continue their senior living community business *without* using Brightview information. The fact that they may lose some opportunity because of an injunction's issuance, due to their own previous misconduct, is not a relevant harm. Out of an abundance of caution, and because Brightview does not insist that a nominal bond is appropriate, *see* ECF 81-1 at 3, the Court will require Brightview to post a $10,000 bond. This amount is more than ample to account for the relevant, and nearly non-existent, harm that could accrue to Defendants because of the injunction's issuance.

## IV.    CONCLUSION

For the reasons set forth above, Brightview's Motion for Preliminary Injunction, ECF 3, is GRANTED. The implementing Order issued on February 21, 2020, ECF 91, remains in effect and unchanged.


Dated:  February 28, 2020                                    _____/s/_____
                                                            Stephanie A. Gallagher
                                                            United States District Judge