**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **BRIGHTVIEW GROUP, LP** | * |
| | * |
| **Plaintiff,** | * |
| | * |
| **v.** | *          **Civil Case No. SAG-19-2774** |
| | * |
| **ANDREW M. TEETERS,** *et al.*, | * |
| | * |
| **Defendants.** | * |
| | * |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

## MEMORANDUM OPINION

Brightview Group, LP ("Brightview") filed this lawsuit against its former employees, Andrew M. Teeters and Ross T. Dingman, and an entity created by Teeters and Dingman, Monarch Communities, LLC ("Monarch") (collectively "Defendants") in September, 2019. Brightview alleges Defendants misappropriated trade secrets in violation of the Defend Trade Secrets Act of 2016 ("DTSA") and the Maryland Uniform Trade Secrets Act ("MUTSA") and unfairly competed with Brightview. ECF 38 ¶¶ 106–20, 129–35. Additionally, Brightview alleges that Teeters and Dingman "breached their fiduciary duties by usurping corporate opportunities" from Brightview. *Id.* ¶¶ 121–28. Discovery is now complete, and both parties have submitted Motions to Exclude some of the opposing side's proffered expert witness testimony. ECF 159; ECF 162. I have reviewed the motions, responses in opposition, and replies and exhibits attached thereto. ECF 159; ECF 173; ECF 179; ECF 162; ECF 176; ECF 180. No hearing is necessary. *See* Loc. R. 105.6

(D. Md. 2018).  For the reasons that follow, Defendants' motion, ECF 159, will be granted in part and denied in part, and Brightview's motion, ECF 162, will be granted in part and denied in part.[1]

## I.    FACTUAL BACKGROUND

Brightview develops and operates senior living communities.  Teeters and Dingman, who formerly held high-level positions at Brightview, are accused of using Brightview's documents, containing confidential, proprietary and/or trade secret information, to form their own senior living community development business, Monarch.  Brightview alleges Teeters and Dingman began working on this new venture during their employment at Brightview.  *See* ECF 38.

On February 21, 2020, after approximately three months of expedited discovery, this Court granted Brightview's Motion for Preliminary Injunction.  ECF 91; *see* ECF 95 (Memorandum Opinion).  Specifically, this Court enjoined defendants "from accessing, using, disclosing, or disseminating" sixty-five Brightview documents.  ECF 91 ¶ 2.  The parties have since conducted months of formal discovery, including the exchange of expert reports and the depositions of expert witnesses.  Defendants now ask the Court to exclude the expert testimony of Marylee P. Robinson, while Brightview asks the Court to exclude or limit the expert testimony of Ronald G. Quintero and Michael Baldwin.

### A.  Marylee P. Robinson's Testimony

Marylee P. Robinson was retained by Brightview "to opine about the value of Brightview's intellectual property and to determine the amount of damages owed by the Defendants in the event they are found liable."  ECF 173-2 at 3 ("Expert Report on Value and Damages").  After issuing

---

[1] The parties also have pending cross-motions for summary judgment, ECF 165 and ECF 186. Because the disposition of the instant motions would determine what evidence this Court properly can consider in evaluating the summary judgment motions, those motions will be addressed in a subsequent opinion.

an initial report on May 1, 2020, Robinson subsequently issued two supplemental reports on May 26, 2020 and July 20, 2020.  ECF 173-3; ECF 173-4.  In the reports, Robinson describes different types of damages that could potentially be available to Brightview if Defendants are found liable. *Id.*  Robinson also produced a Rebuttal Expert Report in response to Quintero's report on August 31, 2020.  ECF 173-5.  Defendants ask the Court to exclude the reports produced by Robinson from the record and to preclude her from testifying at trial under Federal Rule of Evidence 702.

**B. Ronald G. Quintero's Testimony**

Ronald G. Quintero was retained by Defendants to "provide expert opinions pertaining to the three reports . . . submitted in this matter by Marylee P. Robinson."  ECF 162-2 ¶ 1.  In his report, issued on August 17, 2020, Quintero criticizes Robinson's findings and concludes her reports "lack any valid, reliable, or nonspeculative quantification of damages sustained by the Plaintiffs, or of improper financial benefits realized by the Defendants, in this matter."  *Id.* ¶ 77. Brightview requests that the Court exclude all of Quintero's anticipated testimony under Federal Rule of Evidence 702.

**C. Michael Baldwin's Testimony**

Michael Baldwin was retained by Defendants to "opine upon the extent to which certain Brightview materials constitute proprietary information known only to Brightview as opposed to information generally known . . . as well as to opine upon the approximate cost of acquiring such materials in the marketplace."  ECF 162-5 ¶ I.A.  Baldwin specifically offers opinions on twenty-three different documents in his June 1, 2020 expert report.  *Id.* ¶¶ VI.A–E.  In 2011, Baldwin was sued by his former employer, HealthTrust, LLC, for allegedly violating the Florida Uniform Trade Secrets Act.  *See HealthTrust, LLC v. Baldwin*, No. 8:11-cv-02719-DDM-EAJ (M.D. Fla. dismissed July 16, 2012); ECF 180-4 at 351 (Baldwin Depo.).  At deposition, Baldwin refused to

answer Brightview's questions about this prior litigation.  ECF 180-4 at 351–53.  Brightview therefore contends that Baldwin should be barred from offering any testimony in this case under Federal Rule of Civil Procedure 37(c)(1).  Alternatively, Brightview asks the Court to exclude a portion of Baldwin's testimony under Federal Rule of Evidence 702.

## II.    LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony.  A qualified expert may give testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In essence, the trial court must ensure the proposed expert testimony "both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).  In *Daubert*, the Supreme Court provides five nonexhaustive factors a court may weigh in making this assessment: (1) "whether a theory or technique . . . can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) "the known or potential rate of error," (4) "the existence and maintenance of standards controlling the technique's operation," and (5) whether the technique or theory has gained "general acceptance."  509 U.S. at 592–94; *Pugh v. Louisville Ladder, Inc.*, 361 F. App'x 448, 452 (4th Cir. 2010).  However, ultimately, the inquiry is "a flexible one" and relevant factors can vary with the needs of each case.  *Daubert*, 509 U.S. at 594.

For the proffered evidence to be sufficiently reliable it "must be derived using scientific or other valid methods" and not based on mere "belief or speculation."  *Casey v. Geek Squad*

*Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 340 (D. Md. 2011) (first quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999); then quoting *Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 477 (4th Cir. 2005)).  The court's analysis focuses on experts' methods, not their conclusions, but an expert opinion that relies on "assumptions which are speculative and not supported by the record," is inadmissible.  *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").  For the proffered opinion to be relevant, it "must be 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'"  *Casey*, 823 F. Supp. 2d at 340 (quoting *Daubert*, 509 U.S. at 591).  Expert testimony "is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror."  *Anderson v. Home Depot U.S.A., Inc.*, No. GJH-2615, 2017 WL 2189508, at *4 (D. Md. May 16, 2017) (quoting *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993)).

The proponent of the expert testimony bears the burden of establishing admissibility, or "coming forward with evidence from which the trial court could determine that the evidence is admissible under *Daubert*."  *Anderson v. Home Depot U.S.A., Inc.*, No. GJH-14-2615, 2017 WL 2189508, at *3 (D. Md. May 16, 2017) (quoting *Main St. Am. Grp. v. Sears, Roebuck, & Co.*, No. CIV JFM-08-3292, 2010 WL 956178, at *3 (D. Md. Mar. 11, 2010)); *see also Casey*, 823 F. Supp. 2d at 340; *Daubert*, 509 U.S. at 592 n. 10 (explaining admissibility must be established by a "preponderance of proof").

In determining the admissibility of expert testimony, the court considers two "guiding, and sometimes competing, principles." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). On the one hand, Rule 702 was "intended to liberalize the introduction of relevant expert evidence," and the court need not ensure the expert's proposed testimony is "irrefutable or certainly correct." *Id.* (explaining that admissible expert testimony can still be vigorously tested before the jury by "cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" (quoting *Daubert*, 509 U.S. at 596)). On the other hand, "due to the difficulty of evaluating their testimony, expert witnesses have the potential to 'be both powerful and quite misleading.'" *Id.* (quoting *Daubert*, 509 U.S. at 595). The court must determine whether the disputed expert testimony "has greater potential to mislead than to enlighten." *Id.* If so, the testimony should be excluded. *Id.*; *see also Casey*, 823 F. Supp. 2d at 340 (noting such testimony would be barred by Federal Rule of Evidence 403).

## III.    ANALYSIS

The Court first determines whether Robinson's reports and Quintero's rebuttal report are admissible. Next, the Court examines the propriety of Baldwin's testimony both under Rule 702 and Federal Rule of Civil Procedure 37(c)(1).[2]

### A.  Robinson's Testimony

Robinson's reports opine on the availability and amount of five different categories of damages should Defendants be found liable: (1) Brightview's lost profits, (2) disgorgement of Monarch's profits, (3) head start damages, (4) saved costs of development, and (5) disgorgement

---

[2] Neither party premises their motion to exclude on the lack of qualifications of the opposing expert witness or witnesses to offer expert testimony. Rather, their motions focus on the reliability and relevance of the experts' particular assessments. The Court concludes the witnesses are qualified experts and focuses its discussion on the admissibility of the proffered testimony.

of Teeters's and Dingman's earnings at Brightview.  As detailed below, Robinson's opinion on lost profits is potentially admissible; however, her analyses of the other four types of damages are speculative, unreliable, or otherwise unhelpful and will be excluded.

### 1. Brightview's Lost Profits

Robinson's lost profits analysis is premised on the loss of profits from undeveloped future communities that Brightview could have potentially built and operated in a number of cities, but for Defendants' conduct.  Specifically, her reports reference thirty-two properties that "Brightview contends . . . may be opportunities that related to the work the Defendants were doing at Brightview prior to their departure."  ECF 173-4 ¶ 10.  Robinson opines that "should the trier of fact find that Brightview has been precluded from pursuing those opportunities, Brightview would be owed lost profits."  *Id.* ¶ 11.

Defendants first argue Robinson's lost profits testimony is inadmissible because there is no evidence in the record to indicate that Brightview has been precluded from pursuing any of the thirty-two sites Robinson mentions.  ECF 179 at 4 n.1.  Therefore, Defendants assert, as Robinson's precondition for awarding any lost profits is unmet, the remainder of her testimony is "entirely speculative."  ECF 159-1 at 11.  In ruling on this motion, however, the Court does not determine the merits of any causes of action, and does not prejudge the still-pending motion for summary judgment, which squarely presents the issue of whether Brightview has adduced evidence sufficient to establish a genuine issue of material fact that it sustained lost profits from Defendants' conduct.  If at trial or at summary judgment, Brightview fails to present sufficient evidence that it lost any particular opportunity, Robinson's prospective lost profits testimony would likely be excluded under both Rule 702 and Rule 403.  That question, however, is not

germane to the instant motion, which focuses on Robinson's methodology of calculating a lost profits award, should one be viable.

Defendants next argue that Robinson's lost profits testimony should be barred because her analysis merely adopts Brightview's own calculations, which are themselves unreliable and largely speculative. ECF 159-1 at 11–14. Robinson examined Brightview's data on returns generated from existing communities to estimate profits for its potential future communities. Specifically, Robinson opines that if Brightview developed any one of the identified properties, it would create profits approximately equal to the average profits produced by ten of Brightview's current communities, or $73,273 per individual housing unit. *See* ECF 173-3 ¶ 10–12 (referencing "Summary of Actual Returns – SSL IV.xls."). Brightview informed Robinson that their current communities contain an average of 165 housing units, therefore, Robinson calculates the lost profits for each location allegedly usurped by Defendants to be $12,090,099. *Id.*

Although this rate of return proffered by Robinson is a direct adoption of Brightview's calculations, Robinson personally examined Brightview's records to ensure the accuracy of the data. *See* ECF 173-5 ¶ 31 ("I have reviewed documents produced by Brightview that contain investment and distribution amounts specific to the SSL IV fund. These documents contain detailed entries that are drawn directly from Brightview's general ledger."). She also has explained why she thinks these records are particularly helpful for calculating future damages. *Id.* (stating that "the most recent initial recapitalization is the appropriate set of returns to use in calculating the per unit return for the lost profit damages" and responding to other criticisms). Therefore, Defendant's argument that Robinson's opinion is unreliable because it merely "regurgitat[es] a number provided to her by Brightview," ECF 159-1 at 8, is unpersuasive. *See CIT Group/Business Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673, 677–78 (S.D.N.Y. 2011)

(holding expert's lost profits opinion inadmissible because it was "based on conclusory statements of the expert's client" regarding deals that were never finalized, but allowing expert testimony about lost profits that was based on actual revenues received and costs incurred).

Furthermore, damages based on lost profits need not be shown "with absolute certainty," and one can, in some cases, look to past performance to estimate future returns. *See, e.g.*, *GAI Audio of N.Y., Inc. v. Columbia Broad. Sys., Inc.*, 27 Md. App. 172, 197–201 (1975) (affirming lost profits award for lost record sales based on company's previous average costs and revenues); *Fowler v. Printers II, Inc.*, 89 Md. App. 448, 476 (1991) ("Evidence of past profits in an established business furnish a reasonable basis for future profits . . . profits made by others . . . in a similar business or under similar contract . . . may also afford a reasonable inference of the plaintiff's loss." (quoting 11 W. Jaeger, *Willison on Contracts*, § 1346A (3d ed. 1968))). Defendants' criticisms of Robinson's methodology—principally that she did not conduct site-specific analyses and account for geographic differences that could affect profitability—do not render her opinion wholly unreliable. *See Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 163 (4th Cir. 2012) (upholding the admission of expert testimony despite the opposing party's argument that it contained "technical deficiencies" that made it less accurate). If Robinson's testimony proves admissible at trial once a foundation has been laid to establish that Brightview has been precluded by Monarch from developing one or more properties, Defendants will be free to argue the perceived deficiencies in Robinson's methodology to the trier of fact, through cross-examination or the presentation of contrary evidence. *See Daubert*, 509 U.S. at 596.

### 2. Disgorgement of Monarch Profits

Next, Robinson opines that Brightview may recover Monarch's profits under a theory of unjust enrichment. Notably, it is not disputed that Monarch is not currently operating any senior

living facilities and has not generated any profits to date. *E.g.*, ECF 180 at 11 (noting this fact is "undisputed"). Still, Robinson proffers that Brightview could recover profits "derived from" its capital investments. ECF 173-4 ¶ 12. According to Robinson, this also would allow Brightview to "disgorge any salaries or distributions" Teeters and Dingman were paid from these capital investments. *Id.* ¶ 12–13. Robinson specifically disclaimed that her opinion includes any finding on whether or to what extent Monarch's investors were swayed to contribute to Monarch's business because of Defendants' possession or use of Brightview's trade secrets. *See* ECF 159-7 at 191–92 (agreeing that it does not "fall within the scope of [her] assignment" as an expert witness to opine on whether a particular investor would have invested in Monarch had it not shared Brightview's alleged trade secret information). Furthermore, Robinson's opinion does not attempt to calculate what portion of Monarch's profits, or Teeters's and Dingman's salaries, should be attributed to their use of trade secrets, but merely opines that "[*a*]*ny* profits earned by Monarch as a result of [Defendants'] misappropriation of Brightview's trade secrets . . . would be eligible for disgorgement." ECF 173-2 ¶ 30 (emphasis added). In essence, Robinson's statement amounts to nothing more than an expression that the disgorgement of profits is an appropriate method for calculating damages in a DTSA or MUTSA case.

However, should Brightview prove Defendants' liability, the question of whether, categorically, Brightview may recover profits gained from use of Brightview's trade secrets is a purely legal question and therefore an "inappropriate subject[] for expert testimony." *Sun Yung Lee v. Clarendon*, 453 F. App'x 270, 278 (4th Cir. 2011) (upholding the exclusion of an expert report that opined not to facts at issue, but "on ultimate questions of law"); *Peters v. Balt. City Bd. of Sch. Comm'rs*, No. WMN-13-3114, 2014 WL 4187307, at *7 (D. Md. Aug. 21, 2014) ("[E]xpert testimony as to legal conclusions is generally inadmissible."). Because Robinson does not offer

any additional "scientific, technical, or other specialized knowledge" to assist the trier of fact in determining what amount, if any, of Defendant's funds were gained from the use of Brightview's trade secrets, her opinion regarding the disgorgement of Monarch's profits is a strictly legal proposition, which is unhelpful and inadmissible. This Court will determine what categories of damages might be recoverable and will provide instructions to the jury to guide its award of damages, if any.

### 3. Head Start Damages

Similarly, as a measure of unjust enrichment, Robinson offers that Brightview could recover head start damages. ECF 173-2 ¶¶ 33–35. Through the wrongful use of trade secrets, a party may be able to accelerate the profits of a new enterprise. Head start damages attempt to quantify the benefit resulting from a company being "further along than it otherwise would have been in developing and commercializing its products and services." *Sabre GLBL, Inc. v. Shan*, 779 F. App'x 843, 851 (3d Cir. 2019).

In her three expert reports, Robinson does not provide an estimation of head start damages relating to Defendants' conduct. She merely describes, in general terms, how head start damages could be a method for calculating damages in this case. Specifically, she suggests that "[t]o the extent any of [Monarch's potential project sites] progress to the point of generating revenue, it would be appropriate to evaluate if these sites were developed more quickly than if the Defendants had not misappropriated and used Brightview's trade secrets." ECF 173-4 ¶ 15. Like her opinion regarding disgorgement of Monarch's profits, her legal conclusion does not assist the trier of fact in resolving any issue in the case.

Quintero avers in his response to Robinson's reports that head start damages would be too speculative to quantify. ECF 173-11 ¶ 74 ("The timing and amount of any potential cash flows

that could be attributed to any alleged misuse of the Alleged Trade Secrets is speculative."). In her rebuttal, recognizing that "Monarch has yet to realize cash flow," Robinson suggests using Brightview's earnings as a proxy. ECF 173-5 ¶ 35. Because "the average monthly projected revenue for a Brightview community of 165 units is $1,004,882 at a stabilized occupancy of 94%," she opines that Monarch also "could be earning approximately $1,000,000 a month in revenue." *Id.* Assuming Teeters and Dingman were working on their new venture during the last ten months of their employment at Brightview, Robinson concludes they got a ten-month "head start," and so a reasonable estimation of their head start revenue is $10 million. *Id.* In sum, she suggests Brightview could recover $10 million, less Monarch's expenses, for any facility Defendants began developing while working for Brightview.

These projected revenues, however, are overly speculative to form a reliable basis for head start damages. As Robinson readily admits in her report, she is not "in a position to know" what kind of impact Defendants' alleged use of trade secrets will have on how quickly Monarch becomes profitable. *Id.* Because Monarch has never operated a senior living community, or even begun constructing one, to assume it will quickly produce the same revenues Brightview presently derives from its well-established communities is overly speculative. *See Carbo Ceramics, Inc. v. Keefe*, 166 F. App'x 714, 724 (5th Cir. 2006) (finding "any damage model based on speculative revenues and operating profit from an unbuilt plant, is in an[d] of itself, inherently speculative").

In *Carbo Ceramics, Inc.*, the defendant was accused of stealing trade secrets from a ceramic manufacturer in order to establish his own manufacturing facility. *Id.* at 716–20. The proffered damages theory used projected revenues and profits from defendant's own nascent business plan and assessed the amount of those profits that could be attributable to the trade secrets at issue. *Id.* at 723–24. In assessing the defendant's profit projections, the expert compared them to other

industry data as well as the plaintiff's business plan.  *Id.*  Still, where the defendant had "neither built a plant nor produced a product," the court found the revenue projections "simply too speculative" to assess unjust enrichment damages.  *Id.* at 724.

Here, Monarch, much like the defendant in *Carbo Ceramics, Inc.*, has not constructed any senior living facilities.  Moreover, Robinson's calculations appear even less grounded than those rejected by the Fifth Circuit, which, unlike Robinson's projections, at least attempted to account for variation in the industry.  Although the Court recognizes the need to allow "a flexible and imaginative approach" to calculating damages in trade secrets cases, *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 535 (5th Cir. 1974), the Court is not convinced that Robinson's proffered head start damages estimations exceed mere speculation.  Therefore, Robinson's testimony regarding head start damages will be excluded.  *See Bryte ex rel. Bryte*, 429 F.3d at 477 ("*Daubert* aims to prevent expert speculation . . . .").

### 4.  Saved Costs of Development

Additionally, as a final proposed measure of unjust enrichment, Robinson opines Brightview could recover the costs of development Defendants saved by taking Brightview's intellectual property.  Instead of relying on profits generated from a trade secret's use, a plaintiff may "seek damages measured by the costs saved by the defendant" because of their misappropriation.  *Carbo Ceramics, Inc.*, 166 F. App'x at 723; *Sabre GLBL, Inc.*, 779 F. App'x at 851 (explaining "saved costs of development" damages seek to quantify the benefit from a defendant's "ability to avoid incurring certain research and development costs by using the confidential information and trade secrets").

The extent of Robinson's opinion regarding saved costs of development offered in her reports is her straightforward summation that "[t]he saved cost of development for the Defendants

can generally be measured by the hours spent developing the confidential materials multiplied by the hourly cost of compensation of the Brightview employees who developed those materials." ECF 173-2 ¶ 37.  This method assumes Monarch would need the same number of employees to expend the same number of hours developing these documents and would pay them a comparable wage.  The remainder of her report on saved costs of development recites the estimates generated by Brightview of how much it cost Brightview to develop documents alleged to be trade secrets. ECF 173-3 ¶¶ 16–20 (explaining "Brightview has undertaken an exercise to determine the cost of development" in her report); ECF 159-7 at 244 (testifying that Brightview determined the hours worked and compensation of employees who developed the documents then reported the costs to Robinson).  Robinson attempted to verify the accuracy of some of the inputs to Brightview's estimations by examining payroll records.  ECF 173-1 at 230–32.  However, even assuming Brightview's calculation of the costs it expended to develop the documents is accurate, Robinson admitted at deposition that she did not have the knowledge or experience to know whether the hours and costs expended were reasonable.  *Id.* at 227–29.  In sum, she applied no "scientific, technical, or other specialized knowledge" in evaluating the costs of development, but simply offers Brightview's calculations of the costs as her own without any basis for knowing whether Brightview's estimation of the costs saved to Monarch is realistic or reasonable.  "When an expert's proffered opinion merely parrots information provided to [her] by a party, that opinion is generally excluded."  *King-Indiana Forge, Inc. v. Millennium Forge, Inc.*, No. 1:07-cv-00341-SEB-DML, 2009 WL 31876855 at *2 (S.D. Ind. Sept. 29, 2009) (excluding damages expert's testimony where expert merely reported his client's calculations of development costs).  Because Robinson's saved costs of development testimony "goes beyond relying on facts or data and instead cloaks unexamined assumptions in the authority of expert analysis," it is inadmissible. *See*

*Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 510 (6th Cir. 2014) (upholding exclusion of expert's damages opinion that "lack[ed] independent verification or analysis").

### 5. Disgorgement of Teeters's and Dingman's Earnings at Brightview

Finally, Robinson avers that if Defendants are liable for unfair competition, Brightview could recover the compensation Teeters and Dingman were "being paid by Brightview while simultaneously working for the benefit of Monarch." ECF 173-2 ¶ 45. She notes the amounts they were paid in salary and the unvested portion of ownership they accrued in certain Brightview funds and explains that Defendants "may be required to disgorge" these payments. *Id.* ¶ 48–49; ECF 173-3 at ¶ 23. Like her testimony on the disgorgement of Monarch's profits, this is simply a legal opinion about what kinds of damages are potentially available and offers no other helpful testimony on a disputed fact or issue in the case. Robinson's testimony regarding the disgorgement of Teeters's and Dingman's earnings at Brightview is therefore inadmissible. *See Sun Yung Lee*, 453 F. App'x at 278 (explaining such legal opinions are "inappropriate subjects for expert testimony").

In sum, Robinson's prospective testimony will be limited to her assessment of Brightview's lost profits, to the extent Brightview is able to establish that it was precluded from developing one or more sites by Defendants' actions. Her monetary damages analyses for disgorgement of Monarch's profits, head start damages, saved costs of development, and disgorgement of Teeters's and Dingman's earnings at Brightview are inadmissible, and she is prohibited from testifying about these theories at trial.

### B. Quintero's Testimony

Quintero's rebuttal addresses the five types of damages that Robinson analyzed in her reports. Because Robinson's opinions regarding unjust enrichment (including disgorgement of

Monarch's profits, head start damages and saved costs of development) and disgorgement of Teeters's and Dingman's earnings are excluded, Quintero's rebuttal of those opinions will also be excluded as irrelevant. The remainder of Quintero's report addresses Robinson's qualifications, the value of the alleged trade secrets, and Robinson's lost profits analysis. Each of Brightview's objections to the admissibility of these opinions is addressed in turn.

### 1. Robinson's Credentials

Quintero contends that Robinson's report "does not indicate that Ms. Robinson has the qualifications to opine on the value of intellectual property." ECF 162-2 ¶¶ 9.a, 15. Brightview argues that this assessment is irrelevant because "Brightview has not proffered Robinson as a valuation expert, nor does Brightview intend to present evidence to the jury regarding market value of its intellectual property." ECF 162-1 at 4. Notwithstanding Brightview's stated intent, the first page of Robinson's report claims, "Specifically, I have been retained by counsel for Brightview *to opine about the value of Brightview's intellectual property* and to determine the amount of damages owed by the Defendants in the event they are found liable . . . ." ECF 173-2 ¶ 4 (emphasis added). Furthermore, one type of damages that could be recovered in a trade secrets case is unjust enrichment, and one method of calculating unjust enrichment involves establishing the value of the trade secrets. The Court cannot fault Quintero for directly responding to Robinson's statement. However, because the Court has determined that Robinson's unjust enrichment testimony is inadmissible, Quintero's opinion on her ability to offer testimony on the "valuation of intellectual property" is irrelevant. The only damages assessment the Court has determined that Robinson might be permitted to testify about is Brightview's lost profits, which does not involve assessing the value of intellectual property. Therefore, Quintero's criticisms of Robinson's credentials as a valuation expert are inadmissible.

### 2. Alleged Trade Secrets Value

Similarly, Quintero opines that Robinson's reports "do not provide any evidence that the six categories of Brightview ordinary-course expenditures for which cost-based damages are quantified . . . constitute intellectual property with independent value." ECF 162-2 ¶¶ 9.c, 17–51. Brightview raises several objections to this testimony. ECF 162-1 at 5–12 (arguing Quintero's assessments are unreliable and irrelevant). Again, because Robinson's potential testimony will be confined to her assessment of lost profits, she will not be permitted to offer her opinion on the value of Brightview's alleged trade secrets. Therefore, Quintero's rebuttal testimony is also irrelevant and inadmissible.

### 3. Lost Profits

Quintero offers several criticisms of Robinson's lost profits opinion. Brightview contends his critique is inadmissible because Quintero did not offer a reliable alternative method of calculating lost profits. ECF 162-1 at 16. Developing an alternate set of calculations, however, is not a requirement for a rebuttal expert. *See Funderburk v. S.C. Elec. & Gas Co.*, 395 F. Supp. 3d 695, 717 (D.S.C. 2019); *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 834–35 (D. Minn. 2011) (compiling several cases holding "that rebuttal expert witnesses may criticize other experts' theories and calculations without offering alternatives"). Moreover, Quintero's primary suggestion, that Robinson should have conducted a site-specific analysis for lost profits to account for geographical differences in the market, is not groundless. Both Robinson and Brightview have admitted that inclusion of site-specific factors could lead to different results. ECF 159-7 at 277 (Robinson Depo.) (stating the size and location of a community would impact the "development cost" and "labor cost" and ultimate profitability); ECF 159-12 at 142 (David Carliner Depo.) (acknowledging that "there's many things that go into the profitability of a

community" including "where it's located" and "the economy at the time it's constructed"). Quintero's testimony regarding Robinson's lost profits assessment is both relevant and reliable, and Brightview's concerns with the validity of his testimony are better addressed through cross-examination.

### C. Baldwin's Testimony

As explained below, Brightview's assertion that Baldwin should be barred from testifying based on his refusal to answer questions about a confidential settlement agreement in an unrelated dispute, which concluded over eight years ago, is unfounded.  Brightview's Rule 702 objections to Baldwin's testimony are also unavailing.

#### 1.  Federal Rule of Civil Procedure 37(c)(1) Challenge

Brightview argues that "Baldwin's refusal at deposition to answer questions about his own background and bias should preclude his testimony at trial."  ECF 162-1 at 21.  Baldwin was identified as one of Defendant's expert witnesses.  Defendants provided his signed expert report to Brightview, and Brightview deposed him for several hours.  At the end of the deposition, Brightview asked about a trade secret lawsuit in which Baldwin was sued by Alan Plush, Brightview's rebuttal expert witness.  ECF 162-4 at 351.  Baldwin admitted he was a defendant in the lawsuit, which settled in 2012,[3] but declined to answer any further questions about the dispute, saying, "I would like to decline answering any questions about this unless I'm directed by the court specifically to answer them, and that's because of the confidentiality agreement in our settlement agreement."  *Id.* at 352–53.  Brightview concluded its questioning of Baldwin and did not move for the Court to compel further response from Baldwin.

---

[3] *See HealthTrust, LLC v. Baldwin*, No. 8:11-cv-02719-DDM-EAJ (M.D. Fla. dismissed July 16, 2012).

During Plush's deposition, Defendants also asked about the lawsuit, and Plush confirmed that the parties had entered into a settlement agreement.  ECF 176-5 at 15–16.  Defendants requested Plush produce the referenced settlement agreement.  *Id.* at 16.  However, Brightview's Counsel later informed Defendants by email that "the settlement agreement contains a confidentiality provision that prevents HealthTrust [Plush's former employer and the named plaintiff in the litigation] from providing a copy of [the] agreement or disclosing its contents." ECF 176-7 at 6.  Notwithstanding this understanding, Brightview asked if Baldwin would provide a copy of the settlement agreement two days later.  *Id.* at 3.  None of the witnesses or parties have since produced the agreement.  Based on its belief that Baldwin engaged in and was sued for the same kind of conduct that Defendants are accused of in this case, Brightview now contends that "[b]eing denied Baldwin's position on this materially diminishes Brightview's ability to examine and impeach him."  ECF 162-1 at 22–23.

Federal Rule of Civil Procedure 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Though a district court has "broad discretion" in this analysis, the Fourth Circuit has provided five guiding factors:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003).

Brightview's attempt to fit their concerns about Baldwin's testimony into a Rule 37(c)(1) challenge is unavailing.  There is no unfair surprise to Brightview if Baldwin is permitted to testify,

as Defendants obviously do not intend to have Baldwin testify about the details of his previous lawsuit. ECF 176 at 26 (stating that Baldwin "is not offering an opinion in this case as to any documents of HelathTrust or the circumstances of the 2011 lawsuit"). Moreover, several of the questions Baldwin refused to answer pertain to the contents of the complaint in the previous litigation, a document that is available for public scrutiny. *See* ECF 162-4 at 351–52 (asking questions about what allegations were in the complaint); *see also* Complaint, *HealthTrust, LLC v. Baldwin*, No. 8:11-cv-02719-DDM-EAJ (M.D. Fla. Dec. 8, 2011), 2011 WL 9363316. Brightview could have cured the surprise by asking the Court to compel Baldwin's testimony, but declined to do so. Additionally, the Court does not see, and Brightview does not offer, a reason why allowing Baldwin's testimony will disrupt the trial.

Baldwin's proposed testimony goes to the heart of this case, the qualities of the documents alleged to contain trade secrets. His withheld testimony regarding a previously resolved dispute, on the other hand, may provide potential evidence of bias. However, much of the information regarding the prior litigation is already known to Brightview through publicly available documents and, presumably, through their discussions with their own witness, Plush, who was also involved in the previous case. *See, e.g.*, ECF 162-4 at 353 (asking about statements made to Plush). Finally, Baldwin cited a confidentiality provision in the settlement agreement as his reason for declining to answer further questions during the deposition, the existence of which Brightview's own expert, Plush, confirmed. In sum, Baldwin's "nondisclosure" is substantially justified and will not prevent him from offering any testimony in this case. Brightview will be, of course, free to explore Baldwin's potential bias, including the prior litigation, on cross-examination at trial.

### 2.  Federal Rule of Evidence 702 Challenge

Additionally, Brightview aims to use Federal Rule of Evidence 702 to exclude Baldwin's testimony concerning seventeen specific Brightview documents.  Of the seventeen, eleven of the documents are no longer in dispute in the case,[4] and Defendants agree "Baldwin will not provide testimony at trial concerning documents as to which Brightview does not assert any claims."  ECF 176 at 22.  The Court would also agree that opinions regarding uncontested documents are generally irrelevant to the dispute.  Though Baldwin's opinions about the remaining six documents are relevant, Brightview argues that his characterization of those documents as "readily available in the marketplace" is unreliable.  Finally, Brightview also argues that Baldwin's testimony regarding documents that are "valuable if used in direct geographic competition" should be curtailed.  For the following reasons, the Court concludes that these challenges go to the weight of the evidence, rather than their admissibility.  Baldwin's testimony regarding the disputed documents will be permitted and, unless the contested issues are resolved at summary judgment, will be subject to "cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."  *Westberry*, 178 F.3d at 261 (quoting *Daubert*, 509 U.S. at 596).

### i.  Pricing Sheets

Baldwin opines that the "meaningful data" contained in Brightview's pricing sheets "is already available in the open market albeit not in such a consolidated fashion."  ECF 162-5 ¶ VI.B.1.  According to Baldwin, the information can be found in documents like Brightview's

---

[4] The documents no longer in dispute that are referenced in Baldwin's report are: New Underwriting Assumptions, Meeting Outline, Nutley Investment Committee Presentation, Design Standards, Annual Training Checklists, Systems Training Curricula, Letter of Intent, Profit and Loss Statement for Management Company, Equity Funds Summary, Stamford & White Plains Design/Proforma Review, and Tax Tracking File.  ECF 162; ECF 162-5 ¶¶ VI.B.3, VI.B.5, VI.B.7, VI.B.9–VI.B.10, VI.C.2–VI.C.3, VI.C.5, VI.D.3, VI.E.1–VI.E.2.

operational guidelines document or in other trade association databases, including National Investment Center for Seniors Housing and Care ("NIC") and the Real Estate Information Standards ("REIS").  *Id.*  Brightview contends that this opinion is baseless because the kinds of documents Baldwin compares to the pricing sheets are "orders of magnitude less detailed and comprehensive" and possibly less accurate or current.  ECF 162-1 at 27.  However, undoubtedly, some of the type of information on the pricing sheets is, as Baldwin points out, available through other channels.  *Compare* ECF 162-6 (listing fees and descriptions for various apartments and services); *with* ECF 163-4 (listing apartment types and corresponding rents).  Brightview may disagree with Baldwin's opinion as to what in the pricing sheets is "meaningful data" and can present such arguments to the trier of fact, who may also assess the differences between the pricing sheets and Baldwin's noted comparators.

### ii. Operational Guidelines Manual

Next, Baldwin's report states that the Operational Guidelines Manual does not contain valuable information, but instead describes "standard operating procedures for senior living communities," including "that there should be managers on duty, visitors should be greeted, phones answered."  ECF 162-5 ¶ VI.B.2.  He also states that the manual has "granular detail on Brightview processes," or information like "which pay codes should be used in its accounting system."  *Id.*  Brightview argues that his opinion on the value of this document is unreliable because he "has never operated a senior living community," and has "no professional experience generating, using or reviewing" operating manuals.  ECF 162-1 at 29.  Even so, Baldwin has years of experience in the senior housing industry and has specialized knowledge and experience of how senior living facilities operate.  Throughout his career he has "led the development of thousands of valuations and consulting reports regarding senior living communities" and "developed

experience in the types of data, analyses, reports, and development plans that the industry uses as well as the types of systems and processes that are used." ECF 162-5 ¶¶ II.F–G. That Baldwin has not himself operated a facility or wrote a manual does not preclude him from opining on the value of the information contained in the document.

### iii. New Major Market Opportunities Presentation

Brightview raises two reasons for excluding Baldwin's opinion that the New Major Market Opportunities Presentation. First, Brightview argues that it is unclear whether Baldwin reviewed the pertinent document. ECF 162-1 at 29–30. According to his report, Baldwin reviewed a document titled "Demographics and NIC Data – DC to Boston.pdf." ECF 162-5 ¶ VI.B.4.a. This is the title of the document named in Brightview's Amended Complaint, ECF 38 ¶ 93(d). At deposition, Brightview showed Baldwin a document described by Brightview's Counsel as the "demographics information and NIC data D.C. to Boston document." ECF 180-4 at 212. Baldwin recognized the title page of the document, but as he began looking through the file said, "No, this is not the document that I'm referring to." *Id.* at 213. He further explained, "I recognize the first page, the words there. I did not make particular note of the date. So I can't tell if the date is the same. I do not recall ever seeing the second page where it says, 'Near & Long Term Demographics are solid.'" *Id.* at 213–14. He testified that much of the rest of the document "look[ed] similar" to what he reviewed for his report. *Id.* at 214–15. But, he explained, "[S]ince I have seen differences, I don't want to testify in the affirmative that it is the same document." *Id.* at 215–16. Baldwin was apparently correct. The document he reviewed did not include the second page (i.e. the first page with substantive information) of the document he was shown at deposition. However, the remainder of the document is identical. *Compare* ECF 177-1 (the presentation reviewed by Baldwin before writing his report); *with* ECF 177-2 (the presentation he was shown

at deposition). Brightview does not argue that the omission of the single page of the presentation is material to an analysis of its value, but maintains his testimony should be excluded because it is "not apparent" that he analyzed the presentation. ECF 180 at 17. This argument is unpersuasive. Although Brightview may have been somewhat prejudiced in its ability to probe "[Baldwin's] understanding" of the presentation at deposition because Brightview's counsel showed him a slightly different version of the document, there is neither reason to believe that Baldwin did not review the demographics study presentation (except for the one missing page) prior to issuing his report nor that the additional page would materially alter his opinion.

Alternatively, Brightview argues Baldwin's opinion should be excluded because he "focus[es] on the fact that demographic data is publicly available (at least to those with the necessary software license) while ignoring the fact that the document reflects judgments by Brightview's analysts." ECF 162-1 at 30. This argument, like that regarding the pricing sheets, is one that may be raised to the trier of fact. Brightview's disagreement with the value of the document does not render Baldwin's opinion inherently unreliable.

### iv. Operating Agreements

Regarding Brightview's operating agreements, Baldwin opines, "I have seen similar operating agreements being used by a wide variety of senior living organizations. No competitive value could be reasonably derived by having this information." ECF 162-5 ¶ VI.B.6. Brightview argues Baldwin "lacks foundation" for his opinion because he has not been previously asked for his professional opinion about an operating agreement, because he merely "gloss[es] over" them, and because he has not compared Brightview's operating agreements with others. ECF 162-1 at 30–31; ECF 180 at 18–19. Brightview's contentions somewhat mischaracterize Baldwin's deposition testimony. Baldwin did directly testify that he has not previously been asked for his

24

professional opinion of an operating agreement and that, in his work, an operating agreement "is usually something that [he] gloss[es] over," but he also said he has "read a number of them."  ECF 162-4 at 217.  Although Baldwin could not identify "identical terms" in Brightview's agreement and others he'd read and did not "open[] up another operating agreement and put it side by side with this operating agreement to compare line by line," it does not follow that he has no reliable basis to conclude the content is similar.  *See* ECF 162-4 at 218–19.  Furthermore, as previously discussed, Baldwin has years of experience evaluating senior living communities and assessing documents used in their operations, which provides further basis for his testimony.

### v.  Heat Maps

Baldwin states that the heat maps provide the same type of data that is commercially available through subscription services such as VisionLTC.  ECF 162-5 ¶ VI.B.5.  Brightview argues his opinion is unfounded because the reports generated from VisionLTC are less detailed and less accurate.  162-1 at 32.  Again, Brightview may be correct in their assessment of the differences between Brightview's heat maps and VisionLTC's data.  However, this "apples-and-oranges" argument can be presented to the trier of fact and does not render Baldwin's testimony about the similarities inadmissible.

### vi.  Building Plans

Similarly, Baldwin opines that documents like Brightview's building plans "can be found through online databases such as Dodge and within public records," and, therefore, they have "[n]o competitive value."  ECF 162-5 ¶ VI.B.11.  There are obvious differences between Brightview's building plans and the comparator document from Dodge attached to Baldwin's report, including the level of detail.  *Compare* ECF 163-6; *with* ECF 162-5 app. 5.  Still, this does not render Baldwin's opinion groundless.  Again, Brightview may disagree with Baldwin about the value

derived from the level of detail in its documents, but this argument ultimately goes to the weight of the evidence and not its admissibility.

### vii.  Geographic and Durational Limits

In his expert report, Baldwin classifies five documents as "Proprietary and Valuable If Used In Direct Geographic Competition."  ECF 162-5 ¶ VI.D.  Brightview does not object to this categorization, but contends that the caveats Baldwin includes in his opinion are unsupported, specifically, his assertion that "the extent of potential damage to the Plaintiff would decrease to zero given enough distance between the competitive property to the Plaintiff's property (roughly five aerial miles in an urban area or seven aerial miles in a suburban area) . . . and given enough time (three years)."  *Id.*  Brightview does not object to the admissibility of the proposition that "the competitive value of Brightview's information may decline with time and distance," but does object to the specific numbers offered by Baldwin.  ECF 180 at 20.  Primarily, Brightview argues that these limitations are "fact-dependent" and Baldwin did not sufficiently "investigate the facts" to give a reliable opinion.  ECF 180 at 20.

First, Brightview contends the five-to-seven-mile radius figure is unreliable because Baldwin did not conduct an analysis of the primary market area for any Brightview community.  At deposition, Baldwin testified that to define direct geographic competition "[w]hat matters is the extent of the overlap between the primary market area of the Brightview property and primary market area of the proposed competitive property."  ECF 162-4 at 299.  He admittedly did not conduct a detailed analysis of any of Brightview's properties' primary market areas, but stated it was his opinion that five miles "is a common industry benchmark."  *Id.* at 300.  Similarly, Brightview asserts that the three-year limitation is unreliable because Baldwin admitted at deposition that "there is no standard cutoff."  ECF 162-1 at 34–35; ECF 162-4 at 322.  Instead,

Baldwin explained that, like the geographic limits, "it is an approximation" that he derived based on his "experience in the industry in the past 15 years." ECF 162-4 at 321–22. That Baldwin could have perhaps determined a more accurate geographic area or timeframe for each Brightview property by studying their individual markets, does not make his application of a rough industry benchmark or estimation based on industry experience wholly inadmissible. *See Belk, Inc.*, 679 F.3d at 163 (holding technical deficiencies in expert testimony can reduce the weight of the evidence but do not bar admission). As with their other objections to Baldwin's opinion, these perceived inaccuracies and imprecisions are better addressed through cross-examination at trial and/or the presentation of contrary evidence at summary judgment.

## IV.    CONCLUSION

For the reasons set forth above, Defendant's Motion to Exclude Testimony of Marylee Robinson, ECF 159, is denied as to Robinson's testimony about Brightview's lost profits and granted as to the remainder of her proposed testimony. Brightview's Motion to Exclude Expert Testimony, ECF 162, is denied as to Quintero's rebuttal of Robinson's lost profits testimony and granted as to the remainder of his proposed testimony. Additionally, Brightview's motion, ECF 162, is granted as to Baldwin's testimony regarding documents no longer in dispute, and denied as to the remainder of his testimony. A separate Order follows.

Dated:  February 8, 2021                                             /s/
                                                    _____
                                                    Stephanie A. Gallagher
                                                    United States District Judge