**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **BRIGHTVIEW GROUP, LP** | * |
| | * |
| **Plaintiff,** | * |
| | * |
| **v.** | *    **Civil Case No. SAG-19-2774** |
| | * |
| **ANDREW M. TEETERS,** *et al.*, | * |
| | * |
| **Defendants.** | * |
| | * |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

<u>**MEMORANDUM OPINION**</u>

Brightview Group, LP ("Brightview") filed this lawsuit against its former employees, Andrew M. Teeters and Ross T. Dingman, and an entity created by Teeters and Dingman, Monarch Communities, LLC ("Monarch") (collectively "Defendants") in September, 2019.  Brightview alleges Defendants unfairly competed with Brightview and misappropriated its trade secrets in violation of the Defend Trade Secrets Act of 2016 ("DTSA") and the Maryland Uniform Trade Secrets Act ("MUTSA").  ECF 38 ¶¶ 106–20, 129–35.  Additionally, Brightview alleges that Teeters and Dingman "breached their fiduciary duties by usurping corporate opportunities" from Brightview.  *Id.* ¶¶ 121–28, and engaged in a civil conspiracy, *id*. ¶¶ 136–39.  Brightview now moves for summary judgment on Count I (misappropriation of trade secrets under the DTSA), Count II (misappropriation of trade secrets under the MUTSA), and Count IV (unfair competition).  ECF 165.  Defendants oppose Brightview's motion and filed a cross motion for partial summary judgment as to Brightview's claims for monetary damages for Counts I, II, and IV; its claims for exemplary damages and attorneys' fees under Counts I and II; and liability as to Count V (civil conspiracy).  ECF 186.  Defendant Monarch also separately moves for summary judgment on its liability as to Counts I and II.  *Id.*  The Court has considered the parties' motions, opposition filings,

replies, and exhibits attached thereto.  ECF 165; ECF 186; ECF 195; ECF 201.  No hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2018).  For the reasons explained below, the Court will grant Brightview's motion in part as to Counts I, II, and IV, and deny Monarch's motion as to Counts I and II.  The Court will also issue a permanent injunction in connection with the trade secret and unfair competition claims.  Additionally, the Court will grant Defendants' motion as to the monetary and exemplary damages claims under Counts I and II, and deny their motion as to monetary damages under Count IV and attorneys' fees under Counts I and II.  Finally, the Court will deny Defendants' motion as to Count V.

## I.      FACTUAL BACKGROUND

This is a dispute between an employer and its former employees who left to start their own competing enterprise.  Many employees who move from one business to a competing venture bring to their new employer advantages they gained through their previous work experience.  This case presents questions about what advantages are legally permissible, and what advantages violate the employees' legal duties and obligations of fair competition.  Most of the material facts of the case are undisputed and were recounted in detailed fashion in the Court's previous opinion, *Brightview v. Teeters*, 441 F. Supp. 3d 115, 121–128 (D. Md. 2020).  The most pertinent facts are set forth again below, with the addition of material facts learned during discovery.

### A.  The Creation of Monarch

Teeters and Dingman are former high-level employees at Brightview, a senior living facility developer and operator with several communities along the east coast.  The last positions Teeters and Dingman held at Brightview were that of Senior Vice President of Development and Senior Vice President of Operations, respectively.  ECF 38 at 1.  In those roles, they had access to Brightview's financial and operational data as well as Brightview's plans for future development.

In the summer of 2018, Teeters and Dingman began discussions about leaving Brightview to start their own senior housing company with a former Brightview employee, Michael Glynn. *See* ECF 166-7 (emailing Glynn a "Conceptual Business Plan" on July 24, 2018); ECF 166-8 (responding to Teeters with other "assumptions" about the proposed plan on August 3, 2018); ECF 166-11 and 166-12 (discussing "a draft income statement" and "outlining a company structure" with Dingman and Glynn in August 2018). At the time, Glynn was working for a real estate development company, National Development. Matt Bay, another Brightview employee, was also privy to Teeters's, Dingman's, and Glynn's new "business plan." Teeters and Bay exchanged documents about the new project while they were both employed at Brightview. *E.g.*, ECF 166-14 (emailing Teeters "additions to the business plan" on September 9, 2018).

On September 29, 2018, Teeters emailed Dingman and Glynn a "sample underwriting" for a hypothetical new senior living development project. ECF 166-13. The underwriting was created using Brightview's underwriting system, one of several materials Brightview claims as a protected trade secret in this case. Over the course of the next year, Teeters and Dingman continued creating their new senior living company while they were still employed at Brightview, downloading, disseminating to others, and using for their own purposes a variety of product development, market analysis, and site selection materials that Brightview claims are its trade secrets or proprietary and confidential information. For example, in January, 2019, Teeters sent a "Mid-Atlantic Market Opportunities" presentation, a document Brightview created as a result of a months-long effort to evaluate potential growth markets, to potential collaborators at National Development, ECF 166-27; ECF 166-140 ¶ 54, and in April, 2019 Teeters emailed Brightview's building plans to another potential Monarch investor. ECF 166-37. Sometimes Teeters and Dingman also convinced other Brightview employees to assist them in getting Brightview's information to use to evaluate future

opportunities for Monarch.  *See e.g.*, ECF 166-120 (email chain showing Dingman saying he would ask another Brightview employee to generate income band analyses for locations Dingman, Teeters, and Glynn were interested in pursuing and subsequently sending the analyses to Teeters and Glynn).

In the fall of 2018, Teeters, Dingman, and Glynn were already circulating their nascent business plan to a "high net worth network" of individuals, ECF 166-4.  By early 2019, they began formally pitching their new venture to potential investors.  *See* ECF 166-26 (discussing a January pitch meeting to National Development); ECF 166-28 (discussing a February pitch meeting with Sequoia Heritage).  Bay also assisted in locating possible sources of capital for Monarch, while still employed at Brightview.  *E.g.*, ECF 166-32 (discussing contacts in the Southeast); ECF 166-35 (discussing contacts in Israel).

In April, 2019, Teeters, Dingman, and Glynn pitched their new venture to Mark Stebbins, CEO of PROCON, Inc., an architecture, engineering, and development firm.  ECF 166-40 (thanking Stebbins for meeting with them and stating they were "thrilled with the possibility of partnering").  On April 22, 2019, Stebbins told them he was not ready to invest, stating in an email, "I think it is not profitable enough for me and I think I need a lot more detail."  ECF 166-40.  He also asked for "the example of the deal we discussed last week," and said he was "Happy to discuss further."  *Id.*  Glynn responded to Stebbins the same day writing, "[I] am attaching what [I] have of the sample underwriting we discussed last week" and sending a copy of an underwriting prepared using Brightview's model.  Despite Stebbins's initial hesitancy, his negotiations with Teeters, Dingman, and Glynn continued.  A few weeks after their initial meeting, on May 11, 2019, Glynn sent Stebbins "an updated term sheet," ECF 166-18, and by the end of June they were exchanging comprehensive drafts of an agreement to form a limited liability company that would

4

provide funding to their new venture.  ECF 166-41 (sending a copy of the agreement to Stebbins on June 26, 2019, before getting a full "legal review" by an attorney).

While they were seeking capital investors, Teeters, Dingman, and Glynn were also working with a real estate development firm, Hogan Companies, to acquire real estate for their future senior living communities.  *See, e.g.*, ECF 166-57 (sharing a market study for a potential community location prepared by Hogan Companies with Dingman and Glynn in May, 2019); ECF 166-58 (exchanging an "assignment agreement" and "underlying contract" with Hogan Companies in June, 2019, and discussing plans to pursue multiple locations in Maryland).  In his role as Vice President of Development for Brightview, Teeters was charged with identifying sites to develop Brightview communities and getting necessary jurisdictional approvals for these new projects.  However, it appears that by the Spring of 2019, he was expending significant effort on achieving those tasks for his new business in some of the same market areas and was using not only his own expertise, but also Brightview materials, in the process.  *See, e.g.*, ECF 166-62 (using a Brightview community schematic design as a "placeholder" to obtain a special exception permit).  From May to July, Teeters, Dingman, and Glynn explored the feasibility of acquiring various sites along the east coast.  ECF 166-68 (exchanging demographic reports and market analyses).  They submitted a letter of intent to purchase a site in Pasadena, Maryland, to Hogan Companies at the end of June.  ECF 166-84.  They also eventually negotiated a letter of intent to purchase a site in Montville, New Jersey, notwithstanding their knowledge that a Brightview developer, Dave Holland, was keenly interested in acquiring the site for Brightview.  *See* ECF 166-77 (telling Dingman and Teeters that Holland was "hot on this" in reference to the Montville site); ECF 166-80.  On July 10, 2019, they officially formed Monarch Communities LLC as a registered organization in Delaware.  ECF 166-90.

Meanwhile, Teeters and Dingman had not communicated to Brightview their plans to leave and start a new competing business.  Dingman first gave Brightview notice of his planned departure on July 22, 2019, but agreed to remain employed by Brightview for a transition period.  ECF 166-86; ECF 166-85 at 75–77.  Teeters did not submit his resignation until July 30, one day after he professed his long-term commitment to Brightview at a meeting with Brightview executives.  ECF 166-60 at 30–32.  This inexplicable reversal in Teeters's allegiance prompted Brightview to investigate his recent activities, including his recent communications with Dingman.  *Id.* at 32–33.  Ultimately, Brightview fired Teeters the following day, July 31, 2019.  *Id.*  Dingman, who was on vacation at the time, was also terminated immediately upon his return on August 12.  ECF 166-85 at 75, 120.

After their terminations, Brightview retained and analyzed Teeters's and Dingman's company-issued phones and laptops.  Brightview also discovered that Teeters and Dingman had saved Brightview information to personal portable electronic storage devices.  A forensic analysis of those devices confirmed the presence of thousands of Brightview documents.  ECF 166-95; ECF 166-96.  The reports indicate that in June, July, and August, 2019, Teeters and Dingman downloaded myriad Brightview documents that Brightview claims contain trade secret or confidential and proprietary information.  *Id.*

Approximately one month after Teeters and Dingman's final exit, Brightview filed this lawsuit.  ECF 1.  Since this Court's February 21, 2020 preliminary injunction order took effect, Defendants have been enjoined from using or accessing the documents that are the basis of Brightview's trade secret and unfair competition claims.  ECF 91.  Monarch has continued its operations, but it has not generated any profits.  ECF 186 at 76.

## B.  Brightview's Claimed Trade Secret and Confidential and Proprietary Information

Brightview bases its trade secret and unfair competition claims on seventeen documents (or categories of documents), which it alleges qualify for protection as trade secret and/or confidential and proprietary information.  ECF 165-1 at 15.  The documents include information used for product development, market analysis, and site selection.  The chart below identifies the materials and Brightview's asserted classifications.

| DOCUMENT | ASSERTED CLASSIFICATION |
|---|---|
| **Product Development Materials** ||
| operational guidelines manual | trade secret |
| product innovation project blueprint | trade secret |
| operating agreements | confidential and proprietary |
| **Market Analysis Materials** ||
| heat maps | trade secret |
| historic lease-up performance information | trade secret |
| lease-up pace reports | trade secret |
| lease-up saturation analysis | trade secret |
| pricing sheets | trade secret |
| accrual accounting statements ("P&Ls") | trade secret |
| cross property operating reports | trade secret |
| demographic analyses | confidential and proprietary |
| demographic study for future market development | confidential and proprietary |
| income bands analyses | confidential and proprietary |
| map analyses | confidential and proprietary |
| **Site Selection Materials** ||
| project pipeline | trade secret |
| underwriting system | trade secret |
| building plans | confidential and proprietary |

## II.    LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party bears the burden of showing that there is no genuine dispute of material fact.  *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th

Cir. 1987)).  If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial.  *Id.*  The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial."  *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993)).  The mere existence of a "scintilla of evidence" in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor.  *Id.* at 348 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).  Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another."  *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case.  *Id.* at 352.  The non-moving party "must produce competent evidence on each element of [its] claim."  *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671).  If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial."  *Id.* at 352 (quoting *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)).  In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

III.    ANALYSIS

The Court first analyzes Defendants' potential liability under Brightview's trade secrets and unfair competition claims. Next, the Court addresses whether Brightview has produced evidence to show it is entitled to injunctive relief, monetary and punitive damages, and attorneys' fees for those claims. Finally, the Court examines Defendants' potential liability for civil conspiracy.

### A.  Misappropriation of Trade Secrets

To succeed on a claim for misappropriation of trade secrets under federal or Maryland law, Brightview must show (1) the materials at issue qualify for protection as a trade secret and (2) Defendants misappropriated the materials. *E.g.*, *Philips N. Am. LLC v. Hayes*, No. ELH-20-1409, 2020 WL 5407796, at *7 (D. Md. Sept. 9, 2020). Brightview bases its motion for summary judgment for its trade secret claims on eleven different documents (or types of documents), which fall into three broader categories: product development materials, market analysis materials, and site selection materials. ECF 165-1 at 25. Defendants dispute that any of these items are trade secrets. Defendants also dispute that they misappropriated five of the eleven documents.[1]

### 1.  Trade Secret Qualification

Under the DTSA, "all forms and types of financial, business, scientific, technical, economic, or engineering information," including tangible and intangible property, can potentially qualify for protection as a trade secret. 18 U.S.C. § 1839(3). Similarly, the MUTSA recognizes a wide range of information "including a formula, pattern, compilation, program, device, method, technique, or process," as potential trade secrets. Md. Code. Ann., Com. Law § 11-1201(e);

---

[1] These documents are (1) the operational guidelines manual, (2) pricing sheets, (3) accrual accounting statements, (4) lease-up pace reports, and (5) cross property operating reports. ECF 186 at 46–47.

*accord MicroStrategy Inc. v. Business Objects, S.A.*, 331 F. Supp. 2d 396, 416 (E.D. Va. 2004) (noting that under the Virginia Uniform Trade Secrets Act "[t]he case law is clear that just about anything can constitute a trade secret under the right set of facts").  To be deemed a trade secret by the Court, a plaintiff must show both that (1) the information "derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information" and (2) the owner of the trade secret takes "reasonable measures to keep such information secret."  18 U.S.C. § 1839(3)(A)–(B); Md. Code Ann., Com. Law § 11-201(e)(1)–(2) (defining trade secrets by the same dual requirements of "independent economic value" and "reasonable" efforts to maintain secrecy).  The factors outlined in comment b to Section 757 of the Restatement of Torts guide the Court's analysis.  *See, e.g.*, *Airfacts, Inc. v. de Amezaga*, 909 F.3d 84, 95 (4th Cir. 2018); *Ultimate Outdoor Movie, LLC v. FunFlicks, LLC*, SAG-19-2315, 2019 WL 2233535 (D. Md. May 23, 2019).  Those factors are:

> (1) The extent to which the information is known outside of [plaintiff's] business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measure taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Restatement (First) of Torts § 757 cmt. B (Am. Law Inst. 1939).

The alleged trade secret information at issue in this case can be described generally as "financial" and "business" information.  *See* 18 U.S.C. § 1839(3).  "Maryland courts have repeatedly found that business plans, pricing and cost information, and customer lists for companies operating in competitive sales industries derive independent economic value from their confidentiality."  *Philips*, 2020 WL 5407796, at *8 (citing *Lejune v. Coin Acceptors, Inc.*, 381 Md. 288, 309–10 (2004), and *PADCO Advisors, Inc. v. Omdahl*, 179 F. Supp. 2d 600 (D. Md. 2002)).

This is unsurprising because "[i]n a competition for sales, information about potential customers and their buying habits, a competitor's pricing, business strategies, and vendors is a windfall, granting the recipient a key to undercut the competition's pricing, outbid their vendor contracts, and attract their customers." *Albert S. Smyth Co., Inc. v. Motes*, No. CCB-17-677, 2018 WL 3635024, at *4 (D. Md. July 31, 2018) (finding various business records were trade secrets under DTSA and MUTSA). Still, not all financial information or business planning and operational materials qualify as trade secrets, "particularly when they are 'subject to change' or 'readily available from the marketplace.'" *Philips*, 2020 WL 5407796, at *9 (quoting *Optic Graphics, Inc. v. Agee*, 87 Md. App. 770, 787–88 (1991)). Defendants argue that none of Brightview's asserted trade secret information has independent economic value and that it is not sufficiently protected by Brightview to be deemed a trade secret.

### a. Independent Economic Value

In support of its claims that each of the purported trade secrets derives independent economic value from its secrecy, Brightview offers, primarily, the testimony of David Carliner, Executive Vice President for Development at Brightview, and the expert opinion of Alan Plush. Brightview also suggests that Teeters's and Dingman's use of the documents in their formation of Monarch demonstrates that the materials are valuable to potential competitors. Defendants largely dispute the validity of Carliner's and Plush's conclusions, using the testimony of Teeters and Dingman and the expert opinion of Michael Baldwin. For a number of the claimed trade secrets, the conflicting opinions concerning their independent reproducibility, utility, and availability in the marketplace create a genuine factual dispute that precludes the Court from entering summary judgment. However, as to three of the claimed trade secrets—the cross property operating reports,

the accrual accounting statements, and the lease-up saturation analysis—the Court finds there is no material dispute that they derive independent economic value from their secrecy.

### i.  Cross Property Operating Reports

The cross property operating reports are dense Excel workbooks "that contain granular detail about the financial performance of Brightview's portfolios of properties as well as occupancy, revenue, and expense detail at a community level." ECF 166-140 ¶ 42; 166-149.  One of the reports also includes Brightview's key performance indicators, including the year-to-date and year-over-year performance of its communities.  It is undisputed that the reports contain the most comprehensive compilation of Brightview's financial data and are generated solely from internal information.  ECF 166-140 ¶ 42.  Carliner and Plush both assert that the reports could be valuable if acquired by a competitor because the competitor could use the detailed information to target specific markets and compete effectively against Brightview.  *Id.* ¶ 44; ECF 166-115 ¶ 42–46.  Even Defendants' expert, Baldwin, opined that "[t]his type of property-specific financial information is proprietary, confidential, and could reasonably be used in direct geographic competition for the benefit of a competitor in a wide variety of ways such as in price setting, recruiting, expense management, budgeting, and management reporting."  ECF 186-15 at ¶ VI.D.1.  Defendants argue, though, that only competitors competing in the same market or in close proximity to a Brightview community would derive any value from the reports.  ECF 186 at 51.  Even accepting those limitations as true, there is no dispute that the reports have some independent economic value.  Furthermore, it is undisputed that Monarch is (or at least was at the time the cross property operating reports were obtained) exploring developing properties in some of the same locations Brightview has also been interested in targeting, making these reports significantly valuable to Monarch specifically.  *E.g.*, ECF 196-20 (expressing interest in

"competing with Brightview" to bid on a certain property); ECF 166-65 and ECF 166-66 (discussing interest in developing sites in Paramus, New Jersey, while acknowledging Brightview had a property under contract there).  Therefore, the Court concludes there is no material dispute of fact as to the independent economic value of the cross property operating reports.

### ii.      Accrual Accounting Statements

Similarly, the accrual accounting statements are spreadsheets that contain detailed financial information about Brightview's communities.  ECF 166-148.  They include a breakdown of all the revenues received for various services and all community-level expenses, "down to associate salaries, the cost of food and linens, and physical plant repairs" for each month.  ECF 166-140 ¶ 38.  Carliner suggests that like the cross property operating reports, the accrual accounting statements are valuable to a competitor because it could use the detailed financial information to "undersell[] Brightview in tight markets or, potentially, poach[] Brightview's talent pool."  The documents also provide "a roadmap for expected community performance" that a start-up like Monarch could use to elicit funding from lenders or investors.  *Id.* ¶ 40.  Both parties' experts agree that the statements are "proprietary and valuable" to, at least, direct competitors.  ECF 166-115 ¶ 42; ECF 186-15 at ¶ VI.D.2 (opining that the statements could be used in "price setting, recruiting, expense management, budgeting, and management reporting").  Still, Defendants assert that their value is disputed by pointing to Teeters's deposition testimony that he has "seen a lot of P&Ls from various senior living providers, so [he] would not classify that as proprietary."  ECF 187-2 (Teeters Depo.).  But Teeters's equivocal statement did not specify anything about the circumstances in which he viewed the accrual accounting statements of other companies nor how frequently he had such access.  Even accepting as a fact that Teeters has viewed multiple accounting accrual statements from other providers, it is undisputed that Brightview's statements

are not publicly circulated, particularly to its competitors, and that an outsider could not independently recreate the detailed statements. [2]   In sum, it is undisputed that, like the cross property operating reports, the accrual accounting statements are, at a minimum, of some value to a firm seeking to compete directly with Brightview.

### iii.     Lease-up Saturation Analysis

The lease-up saturation analysis refers to a detailed projection of the performance of a hypothetical future Brightview community, based on an analysis of the supply and demand for senior housing in a specific geographic area.  ECF 166-150; ECF 166-140 ¶ 46.  The analysis relies on data from popular subscription services and "other internally generated sources" from Brightview's "independent research," and is "compiled in a proprietary way that's specific to Brightview."  ECF 195-22 at 82–83.  Using this data, Brightview calculates month-by-month projections for when a hypothetical future community would be "leased-up" to at least 94% of its capacity.  *Id.*; ECF 166-50.  Brightview uses this analysis to determine whether to invest in a particular area.  Defendants do not dispute that a competitor could adopt this analysis to make its own development decisions.  ECF 166-140 ¶ 48.  Indeed, the record shows that Defendants exchanged Brightview's lease-up saturation analysis of a site in Paramus, New Jersey, a location they were keen on developing.  *See* ECF 166-71 (emailing Glynn the lease-up saturation analysis for Joy Farm, a site in Paramus); ECF 166-66 (expressing intent to "continue to pursue" sites in Paramus).

---

[2] Defendants' damages expert, Ronald Quintero, stated in his report, "Several of the items such as accrual accounting statements would be of little or no interest to third parties."  ECF 186-9.  Quintero, however, testified that he never even looked at the accounting accrual statements, ECF 162-2 at 95:15–17, and as this Court explained in a previous order, his testimony is otherwise inadmissible, and does not create a material factual dispute.

Defendants claim the lease-up saturation analysis has no independent economic value because it is simply a comparison of data from popular subscription sources "with further speculation by Brightview that there might be some additional development." ECF186 at 53. This argument alone is unpersuasive. Indeed, the Fourth Circuit has recognized that an "expert arrangement of [data]" may make a document "inherently valuable separately and apart from the publicly available contents." *Airfacts, Inc.*, 909 F.3d at 96 (holding flow charts which arranged publicly available data that incorporated the creator's personal insights was a trade secret). Like the plaintiff in *Airfacts, Inc.*, Brightview has done more than just reproduce subscription data in its lease-up saturation analysis. Defendants do not dispute that Brightview's calculations and projections are valuable both to Brightview and a competitor, like Monarch, seeking to develop a senior living community in the same location. Therefore, there is no material dispute that the lease-up saturation analysis has independent economic value.

### b.  Reasonable Measures to Maintain Secrecy

Like all trade secrets, valuable business and financial information must also be secured by its owner by "reasonable" measures, but as this Court explained in its prior ruling, this does not mean "the best security measures available," *Brightview*, 441 F. Supp. 3d at 131. As the Fourth Circuit has recognized, "[a]bsolute secrecy is not essential" to a trade secret claim. *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 664 (4th Cir. 1993) (alteration in original) (quoting *Space Aero Prods. Co. v. R. E. Darling Co.*, 238 Md. 93, 109–10 (1965)). Courts have found that several measures may constitute "reasonable security measures" including limiting access of information to high-level employees or those with a need to know, storing electronic information on secured servers, and requiring employees to attest to their understanding that the information should be closely guarded. *See Albert S. Smyth Co., Inc. v. Motes*, No. CCB-17-677, 2018 WL 3635024, at

15

*3 (D. Md. July 31, 2018) (holding an employer who prohibited its employees from disclosing company information, stored records on encrypted servers to which a limited number of employees were granted access, and had an employee handbook which made clear that employees could face negative consequences for disclosing company records to non-employees took reasonable measures to guard trade secrets).  In some circumstances, allowing access to the information to a large number of personnel may still be reasonable where the company takes other steps to ensure the disclosure does not extend to other nonauthorized personnel.  *See NaturaLawn of Am., Inc. v. W. Grp., LLC*, 484 F. Supp. 2d 392, 399 (D. Md. 2007) (finding the fact that customer lists were well known among employees and franchisees did not destroy trade secret protection because franchise agreements required return of the customer lists upon termination of the franchise relationship).  Wholesale disclosure of the information to third parties without proper protection may destroy a trade secret claim, *Motor City Bagels, L.L.C. v. Am. Bagel Co.*, 50 F. Supp. 2d 460, 480 (D. Md. 1999), but selective disclosures do not, *Trandes Corp.*, 996 F.2d at 664 ("A trade secret owner . . . does not abandon his secret by a limited publication for a restricted purpose."). Finally, that an employee can obtain or use the information in violation of a company policy does not show that a company failed to take reasonable security measures.  *Albert S. Smyth Co.*, 2018 WL 3635024 at *4 (finding an "employee's failure to protect the confidentiality of business records, in violation of an express policy means no more than that an employee failed to protect the confidentiality of business records" and does not necessarily reflect fault of the employer).

Brightview takes measures to safeguard the secrecy of its purported trade secret information.  The information is largely stored electronically on its limited-access F: drive or in its password-protected Yardi system. *See* ECF 166-140 (describing specific measures taken for each kind of document).   Additionally, Brightview associates who work at Brightview's

headquarters, referred to as "home office associates" and comprising the vast majority of those with access to Brightview's asserted protected information, are required to read and sign a handbook that contains a confidentiality provision. ECF 166-140 ¶¶ 6–8. The handbook provision includes a warning that employees may "be exposed to confidential or non-public information related to [Brightview's] business" and provides examples including, but not limited to, "corporate policies, business strategies, pending negotiations or transactions, pending or potential acquisitions, vendor terms, lists of residents/prospects, and associate records." *Id.* ¶ 8. The handbook further instructs, "Such confidential information is to be used solely for legitimate Brightview purposes and never to be discussed with or divulged to unauthorized people," even once an employee is no longer working at Brightview. *Id.* Brightview also limits any disclosures of the information to third parties. *See generally* ECF 195 at 8–9 (outlining specific third-party disclosures permitted for each document). The Court more specifically analyzes the security measures taken to protect the three documents that have undisputed independent economic value as discussed in the preceding section—the cross property operating reports, accounting accrual statements, and lease-up saturation analysis.

Brightview's cross property operating reports are stored on restricted-access folders on Brightview's F: drive and are available to approximately fifty Brightview personnel. ECF 196-53 ¶ 13. The personnel who have access to the reports include the sales, accounting, and IT employees who create the reports, plus a few executives and their assistants. *Id.*; ECF 166-40 ¶ 43. The reports are not disclosed to any third parties. Defendants speculate that Brightview has withheld

the true "full universe" of personnel who have access to the documents.[3]   This speculation, however, does not create a genuine factual dispute.

The accounting accrual statements are generated on Brightview's password-protected Yardi system.   Approximately sixty-nine Brightview employees have access to the information, including regional directors and certain accounting, IT, and administrative support personnel.  ECF 196-53 ¶ 11; ECF 166-140 ¶ 39.   Additionally, community executive directors and business office managers can access only the reports related to their communities.  ECF 166-140 ¶ 39.   Completed reports are stored on a restricted folder on the F: drive.   *Id.*   In limited instances of certain appraisals, financings, or sales, Brightview has disclosed statements to equity investors and banks who had a need to know and "an agreement or expectation of confidentiality."  *Id.*   Some third-party consultants are also given access to the information, but they also operate under confidentiality agreements.  *Id.*

The lease-up saturation analysis is also stored on Brightview's F: drive and accessible to approximately 140 Brightview home office associates.  ECF 166-140 ¶ 47.   Brightview does not share the analysis with third parties.  *Id.*   Defendants attempt to dispute this fact by pointing to Matt Bay's deposition testimony in which he stated that, while working at Brightview, he personally provided "demographic information" that included "saturation rates" to third party lenders as part of a standard financing request.  ECF 187-4 at 340–42.   A careful reading of the deposition testimony, however, makes clear that Bay was referring to other demographic information that Brightview has admitted it shares with prospective lenders.  *See* ECF 166-140

---

[3] Defendants speculate that more people must have access to the reports because Brightview's damages expert included a spreadsheet in her report that outlines an additional number of personnel involved in creating the document.  However, the spreadsheet includes personnel who conducted accounting work to generate the data that underlies the report and does not reflect only people who worked on or had access to the final reports.  ECF 195 at 24 n.6.

¶ 51 (describing the demographic analyses and explaining that Brightview might provide them to financial institutions when applying for loans). Bay was never asked about the lease-up saturation analysis specifically. ECF 187-2 at 340–42. Although the demographic analyses referred to in the deposition have some similar aspects to the lease-up saturation analysis, there are obvious differences in the kind and amount of information the documents contain. *Compare* ECF 196-24 (lease-up saturation analysis); *with* ECF 196-25 (demographic analysis).

Thus, there is no material factual dispute about the measures Brightview has taken to safeguard the secrecy of these three documents, and the Court finds that, under the circumstances, its protective measures are reasonable. Brightview limited access to a subset of individuals in its workforce with a specific need, made its employees sign a confidentiality policy restricting dissemination of such information, and either did not disclose the information to any third-parties or did so in limited instances where there were reasonable expectations of confidentiality.

In sum, the Court finds that Brightview has presented sufficient undisputed evidence that the cross property operating reports, accounting accrual statements, and lease-up saturation analysis meet the definition of trade secrets under the DTSA and the MUTSA.

### 2. Misappropriation

Additionally, Brightview must show that the proposed trade secrets were misappropriated by Defendants. Under both the DTSA and the MUTSA, a defendant may be liable for misappropriation of a trade secret by his nonconsensual "disclosure or use" of a trade secret. 18 U.S.C. § 1839(5)(B); Md. Code Ann., Com. Law § 11-1201(c)(2). Alternatively, a defendant may be liable for misappropriation by "acquisition" alone where the defendant "knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5)(A); Md. Code Ann., Com. Law § 11-1201(c)(1). The term "improper means" includes "theft, bribery,

misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6); Md. Code Ann., Com. Law § 11-1201(b). One way a defendant might acquire a trade secret by improper means is by "transferring files to [his] personal computer for the purposes of future personal use." *Md. Physician's Edge, LLC v. Behram*, No. CV DKC 17-2756, 2019 WL 4573417, at \*6 (D. Md. Sept. 20, 2019) (citing *LeJeune*, 381 Md. at 315).

Brightview asserts that Defendants misappropriated the alleged trade secrets by acquiring them by improper means, and, in some cases, by using and disclosing the trade secrets as well. *See* ECF 165-1 at 37–39. To substantiate their claims of use or disclosure to a third party, Brightview submits several emails in which either Teeters or Dingman sent trade secret information, including the lease-up saturation analysis, to each other and to other third parties in connection with their development of Monarch. *E.g.*, ECF 166-71 (Teeters sending lease-up saturation analysis to Glynn and Dingman on July 2, 2019). Defendants do not dispute that these email disclosures were unauthorized and, if the information qualified as trade secrets, would constitute misappropriation under the statutes.

As to the cross property operating reports and the accrual accounting statements, Brightview offers a forensic report from analyzing Dingman's personal storage device that shows he downloaded the documents to a folder titled "New Business" on his device near the end of his employment at Brightview. ECF 166-96 at 156–57 (downloading twenty-five accrual accounting statements, "[Community Name]_12_Month_Statement_[Yardi code]_Accrual.xlsx," on July 19, 2019); *id.* at 155 (downloading a cross property operating report, "Copy of Cross_Prop_Rpt_with KPI_June_19.xlsx," on July 15, 2019). Defendants contend that there is a material dispute of fact

as to whether Dingman's downloading of the documents was improper.[4]   Defendants claim

"Dingman has testified repeatedly that he downloaded these documents for legitimate Brightview

business purposes." ECF 186 at 47.  The only testimony referenced, however, is an affidavit signed

by Dingman in September 2019, after the case was initially filed.  ECF 9-1 ¶ 21.  In the affidavit,

Dingman claims he downloaded documents, including the cross property operating reports and

accounting accrual statements, to assist in Brightview's annual budgeting process.  *Id.*  Although

he had already been fired by Brightview, Dingman claims that he had agreed with his supervisor,

Brian Engle, that he "could continue to work at Brightview during the budgeting process."  *Id.*

Downloading the files to his personal device (instead of accessing them on his Brightview

computer when needed) was justified, according to Dingman's affidavit, because "it gave [him]

the ability to look up the information very quickly, and it allowed [him] to do this without being

connected to Brightview's network if at a remote location."  *Id.*

Dingman's supervisor, however, testified at deposition that "Mr. Dingman was not going

to have any responsibility in the budget process" because it was assumed that Dingman would be

gone before the process was completed.  ECF 165-88 at 91.  It is undisputed that Brightview

usually holds a budgeting kickoff meeting in September, and that in the weeks prior to the kickoff,

operational planners begin preparing business plans for the communities.  ECF 196-1 at 330:8–

---

[4] Defendants alternatively argue that mere acquisition of the documents by Dingman, without
further evidence that he used or disclosed the documents to another, does not constitute
misappropriation.  As noted above, this understanding of the statute is incorrect.  *Sys. 4, Inc. v.
Landis & Gyr, Inc.*, 8 F. App'x 196, 200 (4th Cir. 2001) ("[A] plaintiff can state a claim for
misappropriation simply by demonstrating that the defendant acquired its trade secret by improper
means, even if the plaintiff cannot show use of that trade secret."); *Nora Beverages, Inc. v. Perrier
Grp. Of Am., Inc.*, 164 F.3d 736, 750 (2d Cir. 1998) (holding a violation of the Connecticut
Uniform Trade Secrets Act occurs "if the defendant *either* wrongfully acquired plaintiff's trade
secret *or* used or disclosed the trade secret" (emphasis added)).

331:4 (stating the pre-kickoff planning "usually begins in July and runs through August); ECF

165-88 at 92: 10–93:15 (stating that in 2019, the pre-kickoff planning started "somewhere around

August 12th or August 13th).  It is also undisputed that upon his resignation, Dingman had an

initial understanding with Brightview that he would leave the company on July 31, 2019, and that

on July 22, he had another discussion with Brightview where he told Brightview he would

officially leave in September.  ECF 196-1 at 119:12–20; ECF 165-88 at 91: 20–92:4, 94:22–95:4.

Dingman downloaded the cross property operating report and accounting accrual statements on

July 15 and July 19.   At the time, according to Dingman's own testimony, there was an

understanding that he would leave Brightview less than two weeks later.

Moreover, an ample amount of undisputed evidence in this case shows that Dingman was

fully engaged in Monarch's operations in July, 2019, and that he and his partners were using

Brightview's documents in the process.  *See, e.g.*, ECF 166-71 (July 2, 2019 email between

Teeters, Glynn, and Dingman sharing Brightview's demographic analysis, lease-up saturation

analysis and income bands analysis for a site they were interested in developing for Monarch); *see

also* ECF 195-5 (August 21, 2019 email from Dingman to a Brightview employee asking for the

most recent detailed monthly financial statement from one of Brightview's communities to help

him create a Monarch underwriting for a nearby location).  Though, at some point, Dingman may

have offered to continue working for Brightview through the September budgeting period, on

August 8 he had already told Glynn and Teeters he would be free for Monarch meetings on August

20.  ECF 165-87 (responding "I'm assuming I'll be gone from BV by then!").  Additionally, even

assuming Dingman initially thought he would be working on the Brightview budget plans during

the month of July, he could not explain why he would need to be able to quickly access the financial

information of forty different Brightview communities when he was only ever responsible for the

budget and operations of eight communities. *See* ECF 196-1 at 330 (responding "I don't know if I needed all of them," and "Like I may use [the information] at some point and I may not," to questions about why he downloaded pricing sheets for forty communities when he only managed eight); ECF 195-2 at 302 (explaining that Dingman "was responsible only for the [eight] communities in his portfolio" and had no responsibilities for other communities).

Although "'[a]t the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party,' that is true 'only if there is a "*genuine*" dispute as to those facts.'" *Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 779 (2020) (emphasis added) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). When one party's explanation "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the record for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380; *see also Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) ("[T]he pertinent inquiry is whether 'there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" (citation omitted)). A reasonable jury could not find that Dingman downloaded the cross property operating reports and accounting accrual statements to his personal storage device, after he was leaving his position and working for Monarch in his final weeks on Brightview's payroll, for any legitimate business reason, based on the evidence submitted.

Separately, Defendants contend that Brightview has not produced any evidence that Monarch misappropriated any trade secret information, and so judgment should be entered for Monarch on Counts I and II. Although Teeters, Dingman, and Glynn referred to each other as partners for many months, they did not formally establish an LLC in Delaware until July 10, 2019, and Teeters and Dingman did not sign an operating agreement until September, 2019. ECF 187-

2 at 153:5–154:6.  Even so, in Delaware, "[a] limited liability company is formed at the time of

the filing of the initial certificate of formation in the office of the Secretary of State" and "shall be

a separate legal entity." Del. Code Ann. Tit. 6, § 18-201(b).  Defendants provide no support for

their contention that Monarch could not be liable for misappropriating trade secrets prior to Teeters

and Dingman signing the operating agreement, and the Court finds their assertion that Monarch

"was not conducting any operations" prior to execution of an operating agreement to be

unsupported by the evidence.  ECF 186 at 75.  The record clearly reflects that Monarch was an

established legal entity as of July 10, 2019, and was conducting business as a separate legal entity

during that month.  *See* ECF 196-44 at 2 (executing a Letter of Intent to purchase property in New

Jersey on July 26, 2019, as "Monarch Communities LLC . . . a 'start-up' company consisting of

principles [sic]: Michael Glynn, Andrew Teeters, Ross Dingman, and Mark Stebbins").   In

Maryland, "[a] principal is *prima facie* liable for the acts of his agent done in the general course

of business authorized by him."  *Winemiller v. Worldwide Asset Purchasing, LLC*, No. RDB-09-

2487, 2011 WL 1457749, at *2 (D. Md. Apr. 15, 2011) (quoting *Carroll v. State*, 63 Md. 551

(1885)).  As discussed above, no reasonable jury could conclude that Dingman was downloading

Brightview's documents to his personal device on July 15 and 19, 2019, for any purpose other than

to use in Monarch's ongoing operations.  Even if Teeters and Dingman had not officially become

members of Monarch when it was formed on July 10, they were already working on behalf of the

entity.  *See, e.g.*, ECF 166-86 (July 9, 2019 email from Dingman to Glynn and Teeters listing

"tasks that need to get done" including "Create an LLC [by] 7/15"); ECF 166-91 (July 18, 2019

email between Teeters, Dingman, and Glynn discussing a planned development that "could be a

good opportunity for us").  Indeed, the record indicates the only reason Dingman and Teeters were

not named in the initial formation document was because they did not "feel comfortable putting

their name on this since they ha[dn']t left their employer yet."  ECF 166-90 at 3 (July 11, 2019

email between Glynn, Teeters, Dingman, and the attorneys assisting them in creating the LLC).

Therefore, Monarch is liable for Teeters's and Dingman's acts done in the course of their business

with Monarch after Monarch's formation in July, 2019, including Dingman's misappropriation of

the cross property operating reports and the accrual accounting statements.

### 3.  Liability for Trade Secret Claims

Because there is no material factual dispute that three of the documents—the cross property

operating reports, accrual accounting statements, and lease-up saturation analysis—contain trade

secret information and were misappropriated by Defendants, Brightview is entitled to summary

judgment against all Defendants on Count I and Count II.[5]

### B.  Unfair Competition

Unfair competition is a cause of action recognized by Maryland law defined as "damaging

or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort."

*Trimed, Inc. v. Sherwood Med. Co.*, 977 F.2d 885, 891 (4th Cir. 1992) (quoting *Balt. Bedding

Corp. v. Moses*, 182 Md. 229, 237 (1943)).  "What constitutes unfair competition in a given case

---

[5] Because the Court finds that Brightview is entitled to summary judgment as to three of the
contested trade secret documents, it need not make specific findings as to the other eight documents
alleged to be trade secrets in order to find Defendants liable for Counts I and II.  As described
herein, a determination as to the other eight documents would not affect Brightview's available
monetary damages either, because Brightview has not established the existence of any actual
damages relating to any of the documents under a trade secret theory.  The Court has also
determined that Brightview is entitled to its requested injunctive relief as to seven of the remaining
alleged trade secret documents based on Brightview's unfair competition claim.  The only outlier
is the project pipeline.  As the Court further describes in its discussion of Count IV, Brightview
has not met its burden to show that the pipeline is confidential and entitled to protection under
either a trade secret or unfair competition theory.  Therefore, Brightview is not entitled to summary
judgment on Counts I, II, or IV based on the pipeline, and the pipeline will not be included in the
injunctive relief granted at this juncture.  Since Defendants have not moved for summary judgment
as to liability for Counts I, II, and IV, Brightview's claims relating to the pipeline will remain
pending for trial, should Brightview wish to continue to pursue the issue.

is governed by its own particular facts and circumstances," but every case involves a violation of "the general principle that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception." *Elec. Store, Inc. v. Cellco P'ship*, 127 Md. App. 385, 407 (1999) (quoting *Balt. Bedding Corp.*, 182 Md. at 237); *see also GAI Audio of N.Y., Inc. v. Columbia Broad. Sys., Inc.*, 27 Md. App. 172, 192 (1975) ("The legal principles which are controlling here are simply the principles of old-fashioned honesty.   One man may not reap where another has sown, nor gather where another has strewn.").   Acts that constitute unfair competition include those that "substantially interfere[] with the ability to compete . . . or conflict[] with accepted principles of public policy." *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F. Supp. 2d 675, 691 (D. Md. 2012) (citing Restatement (Third) of Unfair Competition § 1 (Am. Law. Inst. 1995)).   Maryland courts have recognized that employees may "prepare or make arrangements to compete with their employers prior to leaving the employ of their prospective rivals." *Md. Metals, Inc. v. Metzner*, 282 Md. 31, 39–40 (1978) (explaining that this supports the policy in favor of free competition in the marketplace).   However, the "misappropriation of trade secrets" and "misuse of confidential information" are "unfair or wrongful act[s]" which go beyond "mere preparation." *Id.* at 39–40, 39 n.3 (citing Restatement (Second) of Agency § 393, cmt. E (Am. Law Inst. 1957) (explaining an agent may make arrangements to compete with the principal prior to termination of the relationship, "except that he cannot properly use confidential information peculiar to his employer's business and acquired therein")); *see also Allan M. Dworkin, D.D.S., P.A. v. Blumenthal*, 77 Md. App. 774, 779 (1989) (stating that even without a valid restrictive covenant, a former employee cannot compete with its former employer "by misuse of trade secrets or confidential information").

In this motion, Brightview contends that Defendants are liable for unfair competition because they misused confidential, proprietary, and trade secret information.  ECF 165-1 at 21–22.  Defendants argue that Brightview has only moved for summary judgment on its unfair competition claim based on the misappropriation of the five documents it does not consider trade secrets.  ECF 186 at 48 ("Defendants allegedly misappropriated and misused documents that Brightview classifies as 'confidential or proprietary' (i.e., documents that it concedes do not qualify as trade secrets).").  This assertion is not consistent with Brightview's Motion or the previous litigation of this case.  *E.g.*, *Brightview Grp.*, 441 F. Supp. 3d at 135 (ruling that "Brightview is likely to establish that those documents have some economic value to competitors, and are not entirely in the public domain, such that they are properly considered to contain, *at minimum*, confidential and proprietary Brightview information" (emphasis added)).  Brightview states in its motion, "Misuse of Brightview's trade secret, confidential, and proprietary information also constitutes unfair competition, as alleged in Count IV."  ECF 165-1 at 21.  The Motion proceeds to describe why it considers all the named documents to be confidential and proprietary.  *Id.* at 30–34.  The Court will not adopt Defendants' self-serving interpretation of Brightview's motion and will consider all the documents that underlie its trade secret claims alternatively to form the basis of its unfair competition claim.[6]

Unlike trade secret information, confidential information does not necessarily derive "independent economic value" from its secrecy.  *See Confidential Information*, *Black's Law Dictionary* (11th ed. 2019) (defining confidential information as "[k]nowledge or facts not in the public domain but known to some, esp. to those having a fiduciary duty not to misuse the

---

[6] Because the Court has already determined that the cross property operating reports, accounting accrual statements, and lease-up saturation analysis are trade secrets, the Court does not consider these documents as a basis for Brightview's unfair competition claim.

knowledge or facts for their own advantage"). Still, for information to be considered confidential, access to the information cannot be "totally unrestricted." *See Blumenthal*, 77 Md. App. at 782 (affirming trial court's determination that patient list was not confidential where "there were no rules, regulations, or known procedures which restricted the availability of the patient information only to select persons" and the former employer "took no measures to guard the [list's] secrecy"); *see also Paccar Inc.*, 905 F. Supp. 2d at 692 (expressing doubt that "the transmission of public documents" could form the basis of an unfair competition claim).

### 1. Confidential Nature of the Information

Brightview has provided evidence that it takes measures to safeguard the information in the documents that form the basis of this claim. Several of the documents are stored on Brightview's F: drive and are only available to Brightview's "home office associates," a group of 140 of the companies approximately 4,600 employees who work out of Brightview's office in Baltimore. ECF 166-140 ¶ 6. Specifically, the demographic analyses, demographic study for future market development, income bands analyses, map analyses, underwriting system,[7] and building plans are only accessible to home office employees. *Id.* ¶¶ 51, 55, 63, 67. The operating agreements are further restricted to a subset of fewer than thirty home office employees, *id.* at ¶ 19, and the project innovation project blueprint was not stored on the F: drive at all, but was only found on Teeters's hard drive before he departed Brightview, *id.* at 15. All home office associates, including Teeters and Dingman, are required to read and sign Brightview's Home Office Associate

---

[7] Defendants point out that Leslie Robinson, Brightview's Regional Vice President of Operations, has shared the underwriting with other Brightview employees, outside of the home office, specifically, executive directors and regional sales directors and managers at the community-level. ECF 195-17 at 99–100. However, she also testified that when sharing the document with these employees she expressly informs them that "it's a Brightview document and not to be shared." *Id.*

Handbook, which expressly prohibits disclosure of "confidential or non-public information related to [Brightview's] business" to "unauthorized people." *Id.* ¶ 8.

Other materials, including the heat maps, historic lease-up performance information, lease-up pace reports, and pricing sheets are accessible through Brightview's Yardi system. This password-protected system is accessible to approximately sixty to seventy Brightview home office associates (largely high-level managerial employees, sales and marketing directors, and IT staff) and a number of community-level personnel whose responsibilities require access to the information, specifically "executive directors, community sales directors, and business office managers." ECF 196-53 ¶ 11. The community-level employees can only access the information concerning their individual communities. ECF 196-53 ¶ 11.

The operational guidelines manual is stored on Brightview's intranet portal, which is accessible to directors, all home office associates, and community-level employees with network credentials. ECF 166-140 ¶ 11. According to Brightview, all its employees "have privileges to the manual" since it contains information that all employees may need to understand how to do their jobs. *Id.* However, because the document is stored electronically, it is only easily retrieved by the limited number of employees with access to Brightview's internal network. *Id.* The manual is not circulated outside Brightview. *Id.* Defendants suggest that because technically all Brightview employees are permitted to reference the manual, "any one of Brightview's 4,600 employees could walk out the door with a manual at any time." ECF 186. But there is no evidence that the manual exists in paper form, and the only evidence of the manual's existence outside Brightview's internal network is the forensic evidence showing the document was downloaded to Dingman's personal storage device prior to his departure. Although Defendants' expert, Baldwin, testified that senior living operators "routinely receive operating guidelines of other facilities as

they hire people over from those facilities," Baldwin also admitted that he has no personal knowledge that Brightview's guidelines have ever been shared in that manner.  ECF 186-17 at 212:1–8.

Accordingly, the Court is satisfied that these policies and procedures show that access to these documents is reasonably restricted.  Defendants argue that because a number of the documents are shared with third party partners doing business with Brightview such as institutional investors, lenders, and engineers, the documents are not confidential.  However, the record indicates that these are selective disclosures, shared for specific business reasons, where there is an understanding of confidentiality.  Aside from pointing to these third-party disclosures, Defendants also contend that some of Brightview's documents are publicly available and, therefore, not confidential because they are shared with government entities or within the senior living industry.  Ultimately, the Court finds these arguments unavailing.

First, based on Brightview's admission that demographic analyses, map analyses, and building plans are sometimes shared with government agencies during permitting processes, Defendants suggest the Court draw "a reasonable inference" that the documents are categorically "a matter of public record."  ECF 186 at 50–51.  This speculation is not supported by any evidence that the documents are publicly accessible or any further elaboration as to why this inference is reasonable.  To the contrary, Carliner stated in his affidavit that "[t]he government agencies do not generally make this information available publicly, nor do they generally disseminate it."  ECF 166-140 ¶ 51.  Because there is no evidence that these limited disclosures make the documents publicly accessible, the Court concludes the documents are still confidential.

Next, at his deposition, Matt Bay testified that historic lease-up information about a number of Brightview communities has been openly touted by Brightview at an industry conference and

was publicly spoken about by "[e]verybody" as "part of the story of Brightview." ECF 187-4 at 184–87. However, he could not recall specifically who shared the information, where, or when, if it was stated at a conference, or if he read about it somewhere. *Id.* at 347–48. Evaluating Bay's testimony in the light most favorable to Defendants, it still does not create a genuine dispute of fact regarding the confidentiality of the historic lease-up performance information and lease-up pace reports. Bay's testimony, at best, indicates that Brightview shared the lease-up rate for three of its communities. The documents taken by Defendants include significantly more information. The historic lease-up performance spreadsheet includes the lease-up period, total project cost, and total cost per unit of thirty different communities. ECF 166-145. The lease-up pace reports include even more detailed information about the performance of at least forty communities. ECF 166-146. There is no evidence that this kind of information is unrestricted or entirely in the public domain. Similarly, Defendants contend that the Brightview's pricing data is available through various means including site visits and other discrete exchanges with competitors, mystery shoppers, and industry databases. ECF 186 at 47–49. But there is no evidence that the consolidated, highly detailed pricing sheets are shared with any competitors or the public at large.

**2. The Project Pipeline**

Unlike the other information discussed above, the Court finds there are material factual disputes about whether Brightview's project pipeline contains confidential information. As defined by Carliner, the pipeline is an ever growing and evolving list of locations where Brightview is considering building new senior living communities. ECF 166-40 ¶ 58. "Any sites that a Brightview developer has 'evaluated,' and that Brightview has not definitely rejected, are part of Brightview's pipeline." *Id.* The pipeline is not memorialized in any one place. *Id.* ¶ 59. It is "referenced in spreadsheets, notes, and lists maintained by Brightview's team of developers." *Id.*

31

Brightview admits that at least some of the sites are publicly listed and are known to their competitors. *Id.* Although Carliner also claims that in some instances, "the availability of a site may be known only to Brightview," Brightview has not put forth evidence to establish this fact as to any specific location. The documents Brightview references in this motion that contain a portion of the pipeline were not created by other Brightview employees or systems, but as Brightview admits, were created by Teeters "in furtherance of his new competitive venture." *Id.* Brightview has been unable to define the scope of what information it considers part of its project pipeline and has not established that the locations are not publicly known or accessible. Accordingly, summary judgment is inappropriate as to Defendants' alleged misuse of the pipeline, and the pipeline will not be included in the injunctive relief granted herein.

In sum, the undisputed facts demonstrate that the operational guidelines manual, product innovation project blueprint, operating agreements, heat maps, historic lease-up performance information, lease-up pace reports, pricing sheets, demographic study for future market development, demographic analyses, income bands analyses, map analyses, underwriting system, and building plans contain Brightview's confidential business information. However, Brightview has not sufficiently demonstrated that its project pipeline is confidential.

### 3. Defendants' Misuse of the Confidential Information

Defendants do not dispute that they misused most of the confidential and proprietary documents by emailing them to each other or to potential investors to assist in establishing a competing business. *See* ECF 166-82 (Teeters sending product innovation project blueprint to PROCON representatives); ECF 166-68 (Teeters sending heat maps to Dingman and Glynn); ECF 166-31 (Glynn sending historic lease-up performance information to Kevin Kelly, a representative of a private equity firm, and copying Teeters); ECF 166-27 (Teeters sending the demographic

study for future market development to National Development associates and copying Dingman and Glynn); ECF 166-68 (Teeters sending demographic analysis for a site to Dingman and Glynn); ECF 166-120 (Teeters sending income bands analyses to Dingman and Glynn); ECF 166-69 (Teeters sending the map analyses to Dingman and Glynn); ECF 166-122 (Teeters sending underwriting to Mark Stebbins, Dingman, and Glynn, and encouraging Stebbins to send to others); ECF 166-37 (Teeters sending building plans to Asaf Arieli, a potential investor, and copying Dingman and Bay).

Defendants do dispute that there is evidence that they misused four of the documents: three documents that Dingman downloaded to the "New Business" drive on his personal storage device in the summer of 2019, discussed *supra* (the operational guidelines manual, pricing sheets, and lease-up pace reports), ECF 186 at 45–47, and the operating agreements, which Teeters emailed to his personal Gmail account on May 6, 2019, *id.* at 49.  As the Court has explained, Brightview has presented sufficient evidence that Dingman downloaded the documents to his personal drive to use in his business with Monarch, and Defendants have not offered sufficient evidence to dispute this fact.  As to the operating agreements, the Court recognizes there is a factual dispute as to whether Teeters misused the document by sending it to his personal email account.  Teeters was given the documents by Brightview in conjunction with a partnership offer.  ECF 166-56.  Although Brightview has presented evidence that Teeters was not seriously contemplating the offer when he asked for the documents to be sent to him, ECF 166-55 (informing Stebbins that Teeters stated "off the record" on April 30, 2019, that he was not interested in the partnership offer and was "anxious to get the new venture going"), this speculation about Teeters's motive is not conclusive in light of Teeters's own explanation that he sent the document to himself to evaluate whether to accept the offer, ECF 186-1 ¶ 8; 166-6 at 199–200.  Teeters did not officially turn down

the partnership until several weeks later, and although the record reflects that Teeters was earnestly invested in Monarch at the time, a reasonable jury could conclude that he was still inclined to evaluate the option to stay with Brightview.  Regardless, because there is no factual dispute that Defendants misused the other documents, the issue regarding the operating agreements does not prevent the Court from granting summary judgment against Defendants on Brightview's unfair competition claim.[8]

### C.  Injunctive Relief

Injunctive relief is an available remedy for both statutory trade secret claims and unfair competition.  *See* 18 U.S.C. § 1836(b)(3)(A) (stating the court may "grant an injunction to prevent any actual or threatened misappropriation" of trade secrets); Md. Code Ann., Com. Law § 11-1202(a) ("Actual or threatened misappropriation may be enjoined."); *GAI Audio of N.Y., Inc.*, 27 Md. App. at 192–93 ("The remedies generally available to a plaintiff who has established unfair competition include injunctive relief . . . .").  Brightview seeks a permanent injunction to enjoin Defendants from misusing its trade secrets and confidential and proprietary information.  The Court has discretion to grant a permanent injunction where plaintiff has shown:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

---

[8] Although the Court recognizes there is a factual dispute as to whether Defendants misused the operating agreements, there is no dispute that they are confidential documents.  Brightview has shown it has been harmed by Defendants' misuse of its confidential information and is threatened by their continued misuse without an injunction.  Although Brightview has not definitely proven in this motion that Defendants have misused the operating agreements to date, the Court still finds it appropriate to enjoin them from such misuse going forward.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690 (4th Cir. 2021); *QueTel Corp. v. Abbas*, 819 F. App'x 154, 157 (4th Cir. 2020) (affirming permanent injunction for trade secrets claim).

First, no evidence uncovered in the parties' discovery period causes the Court to depart from its initial conclusion at the preliminary injunction stage that Brightview has suffered an irreparable injury and will continue to suffer harm without an injunction.  There are no material factual disputes concerning Defendants' misappropriation of Brightview's trade secrets and misuse of Brightview's confidential information.  These acts alone show Brightview has suffered harm.  *See, e.g.*, *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 894 F. Supp. 2d 691, 708 (E.D. Va. 2012) ("[T]he continued use of a purloined trade secret is a harm of significant measure that warrants injunctive relief."), *overruled on other grounds*, 564 F. App'x 710, 712-13 (4th Cir. 2014) (remanding for a new trial due to an erroneous ruling on a pretrial motion in limine); *GAI Audio of N.Y., Inc.*, 27 Md. App. at 193 (remanding unfair competition case with instructions to issue a permanent injunction where defendants appropriated plaintiff's property for use in their own competing business); *see also i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861–62 (Fed. Cir. 2010) (explaining "[i]t was proper for the district court to consider evidence of past harm" even though "injunctions are tools for prospective relief designed to alleviate future harm" since "by its terms the first *eBay* factor looks, in part, at what has already occurred").  Additionally, based on Teeters's and Dingman's pattern of using Brightview's information to prop up their ongoing business by sharing Brightview's information with potential investors and collaborators, there is a threat that they will continue to do so if no permanent injunction is issued.  *See, e.g.*, *KCG Holdings, Inc. v. Khandekar*, No. 17-CV-3533, 2020 WL 11893902, at *17 (S.D.N.Y. Mar. 12, 2020) (holding a plaintiff suffers irreparable harm in trade secrets case when there is a

possibility that defendant "could disseminate the trade secrets he improperly acquired to a wider audience").  Moreover, monetary damages are inadequate in this case because there is a threat of future dissemination of Brightview's trade secret and confidential information.  *See Faiveley Transp. Malmo AB v. Wabtec Corp.* 559 F.3d 110, 118–19 (2d Cir. 2009) (explaining damages will only "provide a complete remedy" if there "is no danger that a misappropriator will disseminate proprietary information").

The balancing of hardships also warrants granting Brightview narrowly tailored injunctive relief.  The Court's preliminary injunction has been effective for the past year, and Defendants have not demonstrated that they have suffered any harm from being subject to that order, nor have they identified what harm they might incur from a similar permanent injunction.  Finally, the public interest is not harmed by the permanent injunction.  The injunction will not prevent the Defendants from participating in the senior living industry entirely or from building their competing business.  It will only prevent them from doing so by accessing or using Brightview's trade secrets and confidential information.  The public interest favors *fair* competition.  It also favors the protection of trade secrets and the discouragement of unfair business practices.  *See NaturaLawn*, 484 F. Supp. 2d at 404; *Advanced Instructional Sys., Inc. v. Competentum USA, Ltd.*, No. 15-CV-858, 2015 WL 7575925, at *6 (M.D.N.C. Nov. 25, 2015); *GAI Audio of N.Y., Inc.*, 27 Md. App. at 192.  Therefore, the Court will issue a permanent injunction enjoining Defendants from accessing, using, or disclosing the documents discussed in this opinion that contain Brightview's trade secret or confidential information.

The permanent injunction will differ from the preliminary injunction in certain respects.  It will not continue to prevent Defendants from using documents that Brightview eliminated as the basis of this summary judgment motion, such as the training curricula documents.  It will not

preclude Defendants from accessing or using the project pipeline, for the reasons described above. Finally, in an attempt to quell potential disputes about the scope of the injunction, the permanent injunction will clarify that Defendants must refrain from accessing or using the documents the Court has determined are trade secrets or confidential. The Defendants will not be enjoined from using or disclosing non-confidential or proprietary information stored in their memories from their work experience, or available from public sources, that may also be contained in some of the documents. Put another way, the Court has not been asked to, and has not found, that each tidbit of information contained in the documents is protected. To the extent Brightview seeks to prove a violation of the permanent injunction, it will have to establish that Defendants' alleged violation stemmed from the misappropriation and use of the actual documents listed on the appendix, not from some independent source.[9]

### D. Monetary Damages

Defendants contend that Brightview has produced no evidence in support of an award of damages, under either its trade secret claims or its unfair competition claim. Under both the DTSA and the MUTSA, monetary damages may include (1) damages for "actual loss caused by misappropriation," and (2) "unjust enrichment caused by misappropriation," or (3) "a reasonable royalty for the misappropriator's unauthorized disclosure or use." 18 U.S.C. § 1836(b)(3)(B); Md. Code Ann., Com. Law § 11-1203(b)–(c). Similarly, a plaintiff may recover monetary damages for an unfair competition claim including "loss of profits" and a collection of the defendant's profits

---

[9] Brightview's concern that this reading could lead to creation of additional "Monarch Morphs," ECF 165-1 at 49–50, is unfounded. The Monarch Morphs appear to have been created by blatantly editing the misappropriated Brightview documents, sometimes so poorly that references to Brightview were left in the resulting morph. Any such continued activity would violate the clear dictates of the injunction because it would require accessing the listed documents. However, incorporation of an item of information that might be in one of the Brightview documents, but is also available elsewhere, into a newly created Monarch document does not result in a "morph."

"arising out of" the offense. *GAI Audio of N.Y., Inc.*, 27 Md. App. at 195–96 (quoting 74 Am. Jur. 2d, Trademarks and Tradenames, § 145). As explained by the Fifth Circuit in a leading trade secrets case, these claims "require[] a flexible and imaginative approach to the problem of damages," *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 538 (5th Cir. 1974), but a damages theory that is overly speculative will not warrant monetary relief. *Carbo Ceramics, Inc. v. Keefe*, 166 F. App'x 714, 723–25 (5th Cir. 2006) (holding plaintiff was not entitled to compensatory damages for trade secrets claims where plaintiff failed to present sound and reliable evidence from which jury could derive a dollar value).

Brightview argues that "the amount of damage a prevailing party has suffered is a question of fact typically reserved for the jury." ECF 195 (citing *Int'l Wood Processors v. Power Dry, Inc.*, 792 F.2d 416, 421 (4th Cir. 1986) (affirming jury verdict for damages in an antitrust case)). Even so, the Court may decide the issue on a motion for summary judgment if it could not "reasonably be resolved in favor of either party" by the jury. *See Variety Stores*, 888 F.3d at 659. "Once the moving party makes a Rule 56 motion" it is up to the nonmoving party—here, Brightview—to "offer[] 'sufficient proof in the form of admissible evidence" that a genuine material dispute of fact remains. *Id.*; *see also Carbo*, 166 F. App'x at 723–25 ("Because Carbo has failed to meet its burden of presenting sufficient evidence demonstrating a triable issue of material fact as to actual damages recoverable under its trade secret misappropriation claim, we affirm the district court's grant of summary judgment as to that claim."). Brightview suggests that it can show it has suffered damages under three theories: lost profits, unjust enrichment, and disgorgement.

### 1.  Lost Profits

Because Brightview detected Teeters's and Dingman's misconduct so close to their departures, and took immediate and effective steps to recover its information and limit Defendants'

continued use, it has not been able to show any actual detrimental effect on its business operations from Defendants' actions. Brightview has presented no evidence that it has lost any profits to date, at any of its existing communities, due to Defendants' misappropriation. Instead, Brightview argues that it should be awarded lost profits at hypothetical future communities because "Defendants have impaired Brightview's ability to develop sites on its pipeline." ECF 195 at 48. However, Brightview simply has not presented evidence to allow a reasonable jury to make such a finding. Instead of responding to Defendants' contention that there is no evidence showing Defendants impaired Brightview's ability to develop any location by proffering evidence for the Court to consider, Brightview avers that because neither party has moved for summary judgment on Count III (usurpation of corporate opportunity), "Brightview has had no occasion to make a complete presentation about its plans and expectations with respect to each usurped opportunity." *Id.* This statement misconstrues Brightview's burden in responding to a Rule 56 motion. Defendants moved for summary judgment as to monetary damages for Counts I, II, and IV of Brightview's complaint, and, therefore, Brightview must produce evidence in response sufficient to "carry the burden of proof in [its] claim at trial." *Mitchell*, 12 F.3d at 1315–16. Brightview is correct that it may be able to present evidence that Defendants usurped one or more corporate opportunities, along with any commensurate request for damages, in connection with Count III of its complaint, which remains pending. But the Court finds Brightview cannot recover lost profits under its trade secrets or unfair competition claims, based on a lack of evidence to defeat Defendants' summary judgment motion.

## 2.  Unjust Enrichment

Brightview claims that it can recover unjust enrichment damages calculated by three different methods: (1) the disgorgement of Monarch's profits, (2) Monarch's saved costs of development, and (3) head start damages.

First, significantly, it is undisputed that Monarch has not generated any profits. *E.g.*, ECF 180 at 11 (noting this fact is "undisputed").  Brightview nonetheless argues that it can recover funds that Monarch's principal investor, Mark Stebbins, invested in Monarch based on the presumption that Defendants' use or acquisition of Brightview's protected information induced Stebbins to make a $3 million investment.  Brightview does not cite any authority to support its assertion that the initial capital investment, which is generally intended at least in part to fund a new business's operating expenses, should be treated as Defendants' "profits."  However, even accepting that premise as true, there is no evidence that Stebbins invested in Monarch because of Defendants' possession of Brightview's information, instead of a variety of other reasons.  After an extensive discovery period, Brightview points to just two email chains in support of its claim: (1) an email from Stebbins to Teeters, Dingman, and Glynn on April 22, 2019, stating he was not sold on investing in their new company because he thought it was "not profitable enough" and needed "a lot more detail," but would be "[h]appy to discuss further," after which Glynn sent him a sample underwriting based on Brightview's model, ECF 196-40; and (2) an email exchange between Stebbins and Teeters on July 29 and 30, 2019 (after Stebbins had already agreed to work with Teeters, Dingman, and Glynn) where Stebbins asked for "projections for any new projects" and Teeters said he would send "new underwritings."  ECF 196-41.  These emails show conclusively that Defendants were using Brightview's underwriting, but they do not shed light on the significance of the underwriting to Stebbins's investment decision.  On the contrary,

Defendants submit an affidavit signed by Stebbins stating that his receipt of the sample underwriting in April, 2019, "played absolutely no role whatsoever in the decision—several months later—to approve the investment in Monarch."  ECF 186-33 ¶ 3.  Stebbins additionally explains that his decision to invest in Monarch

> was made based on my belief in the potential of Monarch given the decades of industry experience that Andrew Teeters, Ross Dingman, and Michael Glynn would bring to the business, as well as my familiarity with the senior living industry and the broader real estate development industry that I have formed over several decades, during which time businesses that I oversee have constructed a number of senior living communities.

*Id.* ¶ 2.  Brightview had the opportunity to develop more evidence on Stebbins's motives during its seven-hour deposition of him, but declined to do so.  Brightview suggests Stebbins should not be believed, but absent any evidence that Stebbins has been untruthful about this point, the Court finds there is no factual dispute about the role of Brightview's information in Stebbins's investment in Monarch.  Therefore, Brightview has not presented sufficient evidence to support its disgorgement of profits theory.

Next, Brightview contends it can recover the costs Defendants saved by using Brightview's trade secrets, instead of developing their own documents or acquiring them through proper methods.  Other courts have recognized the validity of using saved costs of development to estimate unjust enrichment in trade secrets cases.  *E.g.*, *Univ. Sabre GLBL, Inc v. Shan*, 779 F. App'x 843, 851 (3d Cir. 2019); *Computing Co.*, 504 F.2d at 538–39; *Motorola Sols., Inc. v. Hytera Commc'n Corp. Ltd.*, No. 1:17-cv-1973, 2020 WL 6554645, at *13 (N.D. Ill. Oct. 19, 2020) (awarding avoided research and development costs under DTSA); *PPG Indus. v. Jiangsu Tie Mao Glass Co., Ltd.*, No. 2:15-cv-00965, 2020 WL 1526940, at *17–18 (W.D. Pa. Mar. 31, 2020) (finding saved development costs were appropriate measure of damages in a Pennsylvania

Uniform Trade Secrets Act case).  The Court agrees with Brightview that the evidence shows that several of its asserted trade secrets were used by Defendants to establish their business, to acquire partners, and to identify potential developments.  However, Brightview has not submitted any reliable method for calculating the dollar value of the time and resources Defendants saved by using Brightview's trade secrets.  *See* ECF 202 at 13–15 (explaining that Brightview's damages expert's opinion on saved costs of development is unreliable and inadmissible).  Therefore, Brightview cannot recover damages under this theory.

Additionally, Brightview argues it can recover head start damages.  However, like its saved costs of development theory, for the reasons outlined in the Court's previous opinion, Brightview has not offered any reliable method for calculating the benefit Defendants gained by being further along than they otherwise would have been in developing and commercializing their business.  *Id.* at 11–13 (explaining why Brightview's expert's method for calculating head start damages is unreliable and inadmissible).  In fact, it appears speculative at this stage to believe that Defendants gained any head start benefit at all, given that Monarch remains unprofitable.  When, or whether, it might eventually become profitable is entirely unknown.  Therefore, the Court finds there is not sufficient evidence for a jury to award unjust enrichment damages under any of Brightview's proposed theories.

### 3.  Disgorgement

Finally, Brightview asserts that it can disgorge the compensation it paid to Teeters and Dingman during their final months of employment at Brightview, while they were establishing their competing venture.  As outlined above, under the DTSA and the MUTSA, a plaintiff may be compensated for the misappropriator's unjust enrichment.  "Unjust enrichment of a person occurs when he has and retains money or benefits which in justice and equity belong to another." *Everhart*

*v. Miles*, 47 Md. App. 131, 136 (1980) (citing 66 Am. Jur. 2d Restitution and Implied Contracts § 3 (1973)); *see also Berry & Gould, P.A. v. Berry*, 360 Md. 142, 151–52 (2000). But where an employee satisfactorily performs all the work his employer requires, "there is no injustice in [him] receiving—and retaining—compensation for the work that he did for [his employer's] benefit." *EDI Precast, LLC v. Carnahan*, 982 F. Supp. 2d 616, 631 (D. Md. 2013) (granting summary judgment in favor of defendant on former employee's independently pleaded unjust enrichment claim). Here, like in *EDI*, there is no evidence that Teeters and Dingman failed to perform their work for Brightview adequately, even though they were simultaneously creating a competing enterprise. In fact, Teeters was offered a partnership in Brightview during that period and is one of the few Brightview employees ever to be made such an offer. ECF 186-3 at 37–39. Therefore, the disgorgement of Teeters's and Dingman's Brightview salaries is not an appropriate measure of the benefit unjustly received by Defendants and is not an appropriate remedy for Brightview's trade secrets claims.

Brightview's common law unfair competition claim, however, is premised on Teeters's and Dingman's misappropriation of trade secrets and misuse of confidential information, which amount to a breach of their fiduciary duties of loyalty to Brightview. *See Md. Metals*, 282 Md. at 40 (providing "misappropriation of trade secrets" and "misuse of confidential information" as grounds for "breach of an employee's fiduciary duty of loyalty"). Maryland law recognizes the "general principle that an agent who is guilty of fraud upon his principal, particularly where there is a conflicting interest, concealment, or a willful and deliberate breach of his contract, may be denied compensation for his services." *Md. Credit Fin. Corp. v. Hagerty*, 216 Md. 83 (1958) (holding former employee was not entitled to receive a portion of the compensation "he otherwise would have been entitled to receive" because he willfully and materially breached his duty of

loyalty to his employer); *McGinnis v. Rogers*, 262 Md. 710, 732 (1971) (finding the "age-old principle applicable to fiduciary relationships" requires that where a fiduciary breaches his duty of loyalty he "cannot receive any profit or emolument from the transaction . . . even when the transaction benefits the principal or client").[10]   Recovery of the entirety of a disloyal agent's compensation, however, is not always appropriate.  *See Miller v. U.S. Foodservice, Inc.*, 361 F. Supp. 2d 470, 483–484 (D. Md. 2005).  The extent of recovery depends upon the circumstances: "When there has been a willful breach of his duty, full recovery by the plaintiff has generally been allowed.  Where, however, the conduct of the officer or director was less flagrant, and he had rendered some real service to the corporation, only a part of the compensation has been ordered returned." *Lawson v. Balt. Paint & Chem. Corp.*, 347 F. Supp. 967, 977 (D. Md. 1972) (citations omitted).  And where a breach is only minor, an employee's conduct may not warrant forfeiture of any of his compensation.  *See Shipley v. Meadowbrook Club, Inc.*, 211 Md. 142, 148–49 (1956) (holding employee's disloyal conduct, including use of corporate assets that were later repaid, and possible conversion of a certificate of stock, did not merit application of this rule).

Here, viewing the record in the light most favorable to Brightview, there is sufficient evidence, particularly considering the number of instances Teeters and Dingman secretly used and disclosed Brightview's confidential information for their own personal gain, to conclude that Teeter's and Dingman's unfair competition amounted to more than a minor breach of their duties

---

[10] The *Restatement (Third) of Agency* is also instructive on this point:

> An agent's breach of fiduciary duty is a basis on which the agent may be required to forfeit commissions and other compensation paid or payable to the agent during the period of the agent's disloyalty. . . . Forfeiture may be the only available remedy when it is difficult to prove that harm to a principal resulted from the agent's breach or when the agent realizes no profit through the breach.

Restatement (Third) of Agency § 8.01 cmt. d.(2) (Am. L. Inst. 2006).

of loyalty to Brightview.  Therefore, there is a genuine issue of material fact as to whether Brightview could recoup at least some portion of their compensation.

In sum, there is not sufficient evidence to support an award of monetary damages for Brightview's trade secrets claims (Counts I and II), and Defendants' motion for partial summary judgment will be granted as to those claims.  Defendants' motion will be denied, however, as to the damages claims associated with Brightview's claim for unfair competition (Count IV), because it remains possible for Brightview to pursue a disgorgement of some portion of Teeters's and Dingman's compensation.

### E. Exemplary Damages and Attorneys' Fees

Defendants also assert that there is no evidence to support an award of exemplary damages or attorneys' fees for Brightview's trade secret claims.  Under the DTSA and the MUTSA, where a "trade secret is willfully and maliciously misappropriated" a plaintiff may be awarded "exemplary damages in an amount not more than 2 times the amount of the damages awarded." 12 U.S.C. § 1836(C); Md. Code Ann., Com. Law § 11-1203(c).  Because Brightview has not presented evidence of actual damages or unjust enrichment related to the misappropriation of trade secrets, no damages can be awarded under either statute, and Brightview is not entitled to corresponding exemplary damages.  The DTSA and the MUTSA also allow a plaintiff to recover reasonable attorneys' fees if "the trade secret was willfully and maliciously misappropriated."  12 U.S.C. § 1836(D); Md. Code Ann., Com. Law § 11-1204(3).  The parties dispute whether the record could support a finding of a malicious misappropriation.

As the Fourth Circuit explained in a recent opinion, *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 726–27 (4th Cir. 2021), the DTSA "doesn't define 'malicious,' and we have found no cases that define that term in the context of this statute."  Ultimately, the court upheld a

jury instruction that malicious appropriation requires an "intent to cause injury or harm," because it used the correct definition of malice under the Texas trade secret statute (under which plaintiff also asserted a claim) and because the plaintiff did not offer any argument on why the word should be defined differently under the federal law. *Id.*

The Maryland Court of Special Appeals has defined malicious under the MUTSA as an act done "for an improper motive and without legal justification" and "to deliberately cause harm or injury." *Bond v. PolyCycle, Inc.*, 127 Md. App. 365, 382 (1999). In *Bond*, the Court easily found malicious misappropriation where the defendant not only took the trade secret for his own use, but deleted files from his former employer's computers so that it no longer had access to the trade secret information, which would "interfer[e] with or prevent[] its continuing with its stated corporate purpose." *Id.* Additionally, the trial court judge repeatedly stated on the record that based on his observations of the defendant's testimony, "[t]here was all the ill will you could ever hope for." *Id.* The judge explained, "He [the defendant] was mad at them [his former employer], he was angry with them because he thought they were treating him unfairly." *Id.*

Defendants contend that because they did not prevent Brightview from using any of the alleged trade secrets, under *Bond*, there has been no malicious misappropriation. But *Bond* did not hold that such a showing is required as a matter of law. Still, Bond makes clear that an intent to harm cannot be inferred from any voluntary taking of trade secrets alone. *Id.* at 381–82 (explaining that the act must be *both* willful and malicious); *3PD, Inc. v. U.S. Transp. Corp.*, No. GJH-13-2438, 2015 WL 4249408, at *3 n.1 (D. Md. July 9, 2015) (holding defendant was not entitled to recover attorneys' fees in a MUTSA case where defendant unlawfully took trade secret information but never used the information for its benefit or caused significant injury to the plaintiff); *see also Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1120–21 (Fed. Cir. 1996)

(explaining that every instance of trade secret misappropriation "requires a 'bad act,': the disclosure of someone else's trade secret," and so an award of exemplary damages must be accompanied by something more).

Here, for nearly a year, Teeters and Dingman repeatedly used Brightview's alleged trade secrets to start a competing business. Evidence suggests they were dissatisfied with their current employment situation and wanted to enrich themselves. *See, e.g.*, ECF 166-6 at 90–92 (Teeters explaining that he did not "trust" the Brightview partners and "didn't feel part of the group" and "felt like an outsider"); *id.* at 210 (implying that he would have liked greater compensation from Brightview); ECF 165-4 (Glynn stating in an email to Dingman and Teeters that they were "sitting on a rocket ship headed for a planet of fun and riches"). The record also suggests that Defendants knew what they were doing was inappropriate, and could lead to trouble with Brightview, but continued their endeavor anyway. *E.g.*, ECF 166-53 (Dingman warning Teeters that "we shouldn't be sending out the model to these guys. We need to be protecting that"); ECF 166-81 (telling other PROCON employees to "be careful not to mention anything relating to the business deal Mark [Stebbins] is working on with Andrew [Teeters] and Ross [Dingman]" when Teeters and Dingman were meeting with PROCON on behalf of Brightview); ECF 166-97 (Teeters telling others working with Monarch not to contact his cell the day he was fired from Brightview and PROCON employee asking in response whether he "ha[d] a chance to clear [his] phone"). Defendants also shared some of Brightview's alleged trade secrets with competitors and encouraged third parties to pass them along to others. They passed off some of the alleged trade secrets as their own work in order to garner support for their new enterprise, and they demonstrated an intent to compete directly with Brightview in certain communities and even to seize a site for their new business despite knowing Brightview was also interested in taking control of the same location. Viewing

47

these facts in the light most favorably to Brightview, a jury could reasonably infer that Defendants misappropriated the alleged trade secret information without legal justification and with the intent to cause Brightview harm.  Although these circumstances could also be consistent with another motive, such as the desire to compete in the marketplace or to develop a thriving community for seniors, this material factual dispute prevents the Court from granting summary judgment as to whether Brightview is entitled to recover its attorneys' fees.

### F.  Civil Conspiracy

Finally, Defendants argue that judgment should be entered in their favor on Count V as a matter of law, because civil conspiracy is preempted by the MUTSA.[11]  The MUTSA contains an express preemption provision, which state that the law "displaces conflicting tort, restitutionary, and other law of this State providing civil remedies for misappropriation of a trade secret."  Md. Code Ann., Com. Law § 11-1207(a).  Courts have come to differing conclusions about the scope of the preemption provisions in state uniform trade secret acts.  *See Brand Servs., L.L.C v. Irex Corp.*, 909 F.3d 151, 158 n.4 (5th Cir. 2018) (citing several federal and state court cases with varying interpretations of the preemption provision of state uniform trade secret statutes).  The Maryland Court of Appeals has not directly addressed this issue.  However, in this district, the court has repeatedly held that state law claims based on non-trade secret information are not preempted because "information that 'does not qualify as a "trade secret" . . . falls outside of MUTSA protection.'"  *Philips*, 2020 WL 5407796, at *17 (quoting *Telogis, Inc. v. InSight Mobile Data, Inc.*, No. PWG-14-563, 2014 WL 7336678, at *5 (D. Md. Dec 19, 2014)); *Structural*

---

[11] Monarch also argues that it cannot have participated in a civil conspiracy with Teeters and Dingman because it had not yet been formed during the relevant period.  ECF 186 at 79–80.  That argument is rejected for the same reasons described in Section III.A.2 above.

*Preservation Sys., LLC v. Andrews*, No. MJG-12-1850, 2013 WL 3820023, at *5 (D. Md. July 23, 2013).

Here, Brightview's civil conspiracy claim is expressly premised on Defendants "misappropriating Brightview's trade secrets *and other confidential and proprietary information*." ECF 38 ¶ 138 (emphasis added). Therefore, its claim is not entirely preempted by the MUTSA, because it is also based on a conspiracy to wrongly acquire and use Brightview's non-trade secret confidential and proprietary information.[12] Summary judgment is therefore not warranted.

## IV.    CONCLUSION

For the reasons set forth above, Brightview's Motion for Summary Judgment, ECF 165, will be GRANTED IN PART as described herein. Defendants' Cross Motion for Partial Summary Judgment, ECF 186, will be GRANTED IN PART as to the availability of monetary and punitive damages under Count I and II, and DENIED IN PART as to the rest of the motion. A separate order resolving these motions and an order issuing a permanent injunction follow.

Dated:  March 26, 2021                                    _____/s/_____
                                                            Stephanie A. Gallagher
                                                            United States District Judge

---

[12] In their Reply, Defendants put forth a new argument: that Brightview's civil conspiracy claim cannot succeed because Brightview has not established "[a]ctual legal damage" from its unfair competition claim. The Court will not consider this argument in deciding this motion. *See Marshall v. James B. Nutter & Co.*, 816 F. Supp. 2d 259, 264 (D. Md. 2011) ("[T]he ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered.").